consideration, and determine what sum will compensate her because of such inability." Further on the court said: "Whatever damages you may award in that regard must be money damages, no sentiment." The defendant's counsel specifically excepted to the court's permitting the jury to consider inability to bear children as an element of damage, and also excepted to the charge as limited to money damages, as follows: "I also except to what your honor says with regard to the rule of damages being the pecuniary loss for the inability, if there be any, to bear children. The Court: Well, would not a parent have the right to the earnings of a child during minority?" The question of the learned court quoted suggests the theory upon which the court permitted the jury to speculate as to the pecuniary damages suffered for the loss of children unborn and unconceived. It is clear that such damages are too remote and speculative to constitute an element proper to be submitted to a jury. Butler v. M. R. Co., 143 N. Y. 417, 38 N. E. 454, 26 L. R. A. 46, 42 Am. St. Rep. 738. The respondent undertakes to sustain the judgment upon the theory that the defendant, having permitted the evidence as to inability to bear children to be received without objection, is precluded from insisting that it should not have been submitted to the jury as an element of damages. Undoubtedly a party cannot complain because of the admission of evidence received without objection, but that does not preclude him from insisting that the jury shall not be given an erroneous rule by which to measure damages; this even assuming that the evidence was not relevant to any issue as to the plaintiff's injury, which we do not now decide.

The judgment and order appealed from must be reversed, and a new trial granted; costs to abide the event. All concur.

---

(46 Misc. Rep. 30.)

FIRST NAT. BANK OF WARWICK et al. v. MITCHELL et al.

(Supreme Court, Trial Term, Orange County. December, 1904.)

1. BUILDING CONTRACT—CONSTRUCTION—PAYMENTS.
    Where a building contract provides for the erection of a house and stable, the contract is an entirety, and payments made by the owner thereof are to be credited to the account of the whole work.

2. SAME—CONTRACTS WITH SUBCONTRACTOR—LIEN.
    Where a building contract calls for the erection of a house and stable, and successive subcontracts are made under it by one subcontractor, they constitute an entire contract between the owner and the subcontractor, who files a mechanic's lien.

3. SAME—ACTION BY SUBCONTRACTOR.
    Where a subcontractor has been stopped in the performance of the work by disputes between the contractor and the owner, he can recover on a quantum meruit where he has substantially performed his contract, and equities between the contractor and the subcontractor cannot be set up as a defense by the owner.

4. MECHANIC'S LIEN—RESERVED PAYMENT.
    Where a building contract provided that 15 per cent. of the price should be retained until the work was completed, a subcontractor's lien attaches

to all the unpaid money earned by the contractor, unless the amount unearned is insufficient to complete the building by the owner.

**5. SAME—BUILDING CONTRACT—NONPERFORMANCE—CONTRACT PRICE.**

A building contract provided that the contractor before final payment should produce satisfaction pieces of all liens. *Held*, that the contract price for the completion of the work, in an action to enforce a lien, on differences arising between the owner and the contractor, in order to determine the amount to which a subcontractor's lien would attach, is not the reasonable cost of completion, because it includes the payment of liens filed under the prior contracts.

**6. SAME—COMPLETION OF CONTRACT.**

Where the original contractor has suspended operations, in arriving at the fair value of the cost of completion to determine balance to which a mechanic's lien could attach, the value of materials delivered but not used, and extra work done by the original contractor, should be deducted from the amount of the owner's contract for completion of the work.

**7. MECHANIC'S LIEN—ASSIGNMENT.**

A mechanic's lien may be assigned.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Mechanics' Liens, § 375.]

Action by the First National Bank of Warwick and others against John Murray Mitchell and others. Judgment for plaintiffs.

F. V. Sanford, for plaintiffs.
Samuel W. Bower, for defendants.

MADDOX, J. Plaintiff Meyer was a subcontractor, and, if his lien is valid, the main questions here, as between himself and the owner, are whether there was anything due to Dall, the original contractor, pursuant to the terms of his contract, when the lien was filed, and whether there remained, upon the completion of the work contracted for by Dall, any difference between the fair and reasonable cost of completion and the amount unpaid when the lien was filed. Dall's contract was "for the complete erection of house (exclusive of heating and electrical work, which will be done under another contract) at Tuxedo, New York, also the complete erection of stable at Tuxedo, New York," for $74,319, "and additional for rock excavation, if required, one $25/100$ dollars per cubic yard," payable as follows:

"On the first day of each month during the progress of the work the contractor shall file with the architects a true statement of the value of all labor and materials actually incorporated in the building, and on finding the same correct the architects shall issue their certificate for 85% of such amount, or such part thereof as in their judgment is due to the contractor, after deducting the amount of all previous payments. The final certificate shall include the 15% retained on all previous payments."

The contract, plans, and specifications are to be read together, and we find therefrom the contemplation of the parties. It was the erection and completion of a country house, with a stable, at Tuxedo. The contract was an entirety (Ming v. Corbin, 142 N. Y. 334, 37 N. E. 105), such being the intention of the parties, for the contract price included the house and stable as a whole; and the payments were to be made on account of the whole work as it progressed, not for the house and stable separately. Meyer, by

three separate proposals, dated respectively April 3, June 24, and September 28, 1901, which were accepted by Dall, agreed to perform and furnish "at the J. Murray Mitchell house at Tuxedo, N. Y., * * * earth excavation, filling, furnish and lay earthen pipe around foundation, furnish all stone, mortar and labor to complete the building (except the cut stone); * * * to receive and set all cut stone, terra cotta, limestone, granite and bluestone, coal chute; to furnish material and labor for all concrete floors and deafening for hearth, furnish Lafarge cement as per specification in connection with stone work; * * * to grade bleaching yard and furnish material, remove all rubbish in connection with" his "work; do all cutting for other mechanics and include all scaffolding in connection with" his "work" for $12,625, and extra for all "rock excavation * * * one dollar and fifteen cents ($1.15) per cubic yard," and for "dirt excavation * * * twenty-five cents ($0.25) per cu. yd."; to furnish "all cut local stones for quoins, sills and band courses in accordance with revised plans and specifications for the J. Murray Mitchell House at Tuxedo, N. Y.; * * * to furnish the water table on the court side now specified in granite, in local stone cut out as per drawing" for $2,800; also to furnish "all mason material and labor as per plans and specifications for the J. Murray Mitchell stable at Tuxedo, N. Y.," for $3,200, but not to "include brick, bluestone hearth or cap for chimney." Payments for the foregoing were to be made as the work progressed, "85 per cent. as per monthly statement to be rendered," and the balance at 15 per cent. on the completion of the work to the "satisfaction of owner and architect." For obvious reasons I have considered it necessary to here state at some length that which Meyer undertook to do and to furnish. The work was entered upon early in April, 1901, a day or two after the offer of April 3d, and was continued by Meyer until June 4, 1902, when he stopped, having on June 2d received from Dall a telegram so to do.

Meyer's three proposals must, I think, in view of all the circumstances, be deemed an entire contract, more especially as between the owner and himself. From the evidence it would appear that Meyer and Dall so considered it. Payments were made not for the work done and materials furnished on the stable and the house separately, but on account of the whole work performed, including for extras, as it progressed. Meyer first put in his proposal for the mason work on the house and while that was in progress made his offers or bids for the doing the other work specified, whereupon the whole seems to have gone on as under one contract. If it was the intention of the parties that it should be so considered, then that intention must be given effect (Johnston v. Dahlgren, 166 N. Y. 354, 59 N. E. 987), and the proofs lead to the conclusion that such was their intention. Dall's contract called for completion of his work by March 1, 1902. The stable was completed in May, 1902, but the house was not completed in June, 1902, when the owner took upon himself the completion of the work. There had been paid to Dall, up to May 14, 1902, on account of his contract,

$52,455.45, which, upon the evidence, must be held to be approximately 85 per cent. of the value of the work done and the materials furnished by him up to the time of the last estimate furnished. That was in consonance with the contract. No measurements of the work done were ever made; none were called for; and the issuance of the certificates was not made dependent upon measurements. The contemplation of the parties was that 15 per cent. of the value of all work on which payments were made should be retained until the final payment, and should be included in the final certificate; that the judgment of the architects should obtain in determining "the value of all labor and materials actually incorporated in the building." The contractor was to submit a true statement, and, if that was found correct, then the certificate for the 85 per cent. thereof was to issue, but, if that statement was found to be incorrect, then the certificate was to be based on "such part thereof [that is, the statement] as in their [the architects'] judgment is due the contractor"; that is, "the value of all labor and materials actually incorporated in the building." Their judgment was called for, first, as to the correctness of the statement; and, second, if that be incorrect then as to the amount "due," not payable, but then earned, since so determining, whether from the correctness of the statement or upon their judgment as to the amount "due," then the certificate was to issue for the "85 per cent. of such amount * * * after deducting the amount of all previous payments," and we see that "the final certificate shall include the 15 per cent. retained on all previous payments."

Winterburn, one of the "architects, acting for the purposes of" the "contract as agents of the * * * owner," and who had charge of and undertook the determining of the amount due and for which certificates should issue, testified, among other things, that when he went to make an estimate he "thoroughly examined all through"; that he "just examined the whole thing, saw how much of that work was done"; that "he made particular examinations"; that they were "keeping back 15 per cent. of the entire amount all the time on all payments, * * * from month to month"; that in certifying the amounts payable he "knew the amount * * * certified to was not above 85 per cent. of the value of the work performed." This being so, there was due to Dall on his contract at the time of the filing of plaintiff's lien May 20, 1902, something in excess of $9,000, representing the 15 per cent. of the value of the work performed so retained as aforesaid. The estimate of March 26, 1902, was presented to the architects, and the witness Winterburn certified to performance of work calling for the tenth payment of $4,000, and thereafter certified to the last payment—that of May 14th—of $812.19, to pay workmen, whereupon the work was stopped, except some men Meyer still had at work. Meyer was stopped in the further performance of his contract about June 4, 1902, at which time, allowing for his inability to have fully completed his work because of the delays of other subcontractors, he had substantially performed his contract, and may now claim to recover as against the owner upon a quantum meruit. Equities

which might have existed as between Dall and him cannot be availed of by the owner, for there is no privity of contract as between them. He did not abandon his work. He was stopped because of some default on the part of the original contractor, and because of the action of the owner in undertaking the completion of the work by others than Dall.

The complaint alleges substantial performance. Dall is a party to the action, and, as conceded on the trial, was served with the summons and complaint, as were all the other defendants named. The owner only has answered, and as to those who have defaulted in pleading the allegations of the complaint must be taken as admitted. Meyer's contract with Dall was for the excavating, grading, and mason work, exclusive of extras, for $18,625; the rock (to which no question is raised) was done, all amounting to $1,187.45; and other extra work of the value of $1,687 (as to which no question is raised) was done, all amounting to $21,499.45. As said before, there was a substantial performance by Meyer of his work, and an inspection of the photographs numbered 1 to 12, inclusive, leads irresistibly to the conclusion that the mason work upon the building, as called for by Meyer's proposals and the acceptance, was substantially performed. From the evidence it appears that to have fully completed his work would not have cost more than $750; indeed, that, I think, is a liberal estimate. Thus the value of his work then performed was $20,749.45, on account of which he had received payments aggregating $15,242.55, which includes $1,684.55 theretofore paid on account of extras other than rock and earth excavation, leaving a balance of $5,506.90 due to Meyer at the time the work was suspended. He had received from Dall notes amounting to $3,105, not as payment on account, but as collateral whereon to borrow money. These were not paid, and are not considered here.

As stated before, and as will appear from the architects' certificates for payments upon Dall's contract, if such payments represented 85 per cent. of the work actually performed, then there was more than $9,000 earned by and due to Dall remaining unpaid at the time plaintiff's lien was filed, and to that the lien attached, subject, however, to deduction if the amount remaining unearned should prove insufficient to meet the fair and reasonable cost of completing the Dall contract. If, as testified to by Winterburn, the amount theretofore paid, $52,455.45, represented 85 per cent. "of the value of the work performed," then the true value of the work theretofore done was about $61,712.29, and the 15 per cent. thereof retained under the architects' certificates amounted to about $9,256.84. The Dall contract was for $74,319, and the extras, which included $1,029.63 for rock excavation done by Meyer and ordered prior to Dall's suspension of work, amounted to $9,869.14, aggregate $84,188.14, and of this there remained $31,732.69 after deducting the payments of $52,455.45. Again, if the payments made represented 85 per cent. of the value of the work done, then we have a performance of about 73.3 per cent. of the work called for by the Dall contract, including the extras as aforesaid, and this accords with my judgment and conclusion, after a full and careful considera-

tion of the testimony and the exhibits, that the Dall contract had been about three-fourths completed. After Dall's suspension, and in August, 1902, the contract was entered into by the owner for the completion of the unfinished work called for by Dall's contract, including materials to be furnished, also the completion of certain extra work theretofore ordered of Dall, and for the replacement of any defective work on the building, for $35,961.74. If this contract price, $35,961.74, was, as the owner contends, the fair and reasonable cost of the completion thereof, then the work was, in June, 1902, but 57.3 per cent. completed, or 16 per cent. less than contemplated by the architects' certificates for payments, and the architects had certified to and had permitted actual overpayments of upwards of $4,200 to Dall. Can this be deemed likely? In view of Winterburn's testimony and the certificates of his firm, I unhesitatingly answer that it is very improbable, and I do not credit it, for, while Winterburn testified that he made no measurements, yet he examined the work as it progressed, and "knew the amount" he "certified to was not above 85 per cent. of the value of the work performed," and that they "were keeping back 15 per cent. of the entire work all the time on all the payments" from month to month.

Payments under the contract of August, 1902, were to be made practically in the same manner as under the Dall contract—that is, monthly, 85 per cent. of the value of the work done, to be determined by the certificate of the architects based upon monthly statements, itemized, to be filed by the contractors, the remaining 15 per cent. to await the final certificate—but with this further provision; i. e., that the sum of $5,000, a part of the contract price, was to be excluded in estimating such 85 per cent. of the value of the work so done and was to be included with the 15 per cent. retained on all previous payments in the final certificate. It was also therein provided that the contractor shall, before the first payment, "cause to be delivered to the architects satisfaction pieces of all mechanics' lien filed by or against. any of the" persons therein named as contractors; "also a release signed by J. Dall, in the form annexed, in escrow, to be delivered by them to the owner, if he fulfills his obligations under" that "contract. * * * And before the final payment * * * said contractors shall cause all liens now on or which hereafter may be filed against said building or the owner to be satisfied of record; also to deliver to the owner releases in same form, signed and acknowledged by each contractor aforesaid." The final payment was to be made within 30 days after the contract was fulfilled "and the delivery of the release and papers" above indicated. The foregoing is certainly a significant provision, for by it the contractors were, before final payment, to "cause all liens on"—that is, then "against—said building or the owner to be satisfied of record," and plaintiff's lien was then, and for some time prior had been, a matter of record, and was known to the owner and to his architects. Such, however, is the plain language of the contract. There is no ambiguity, and what was its purpose? Was it that the $5,000 so to be excluded in estimating

the 85 per cent. as therein provided, together with the 15 per cent. retained, thus making up the final payment, was to be applied to the payment and discharge of the mechanics' liens then of record of others than those joining in said contract and such as might thereafter be filed? It will be noticed that the liens of those entering into the contract in question were to be discharged before the first payment, and in the next sentence that "all liens now on or which hereafter may be filed" were to be satisfied before the final payment. All who joined in the August, 1902, contract were subcontractors under Dall, though all of them had not filed liens. All of the lienors, excepting Meyer and Androvett, were parties to the contract, and discharged their liens, while all of those subcontracting or doing work for Dall, excepting Meyer and one or two others, joined in or were represented in that contract for the completion of the work. Appended to the August, 1902, contract is a memorandum of the extra work (aggregating $9,869.14) to be completed, and the proof is clear that much of that had been fully completed or partly done before August, 1902; indeed, more than one-third thereof. There was also much material on the premises, some stored in the stable, theretofore delivered and afterward used in the completion of the house. It was of a value greater than $3,000, and that was "included in the sum it took to finish." No estimates of the work done under that contract were submitted, and no measurements were made by the architects. Written requests were made to the architects for payment, and they issued from time to time their certificates upon which $31,800 have been paid, though Randall testified that he had "received $30,500 on account of the completion of the work," and that $5,466.74 remained unpaid. The amount paid is much in excess of 85 per cent. of that contract price, and that without excluding the $5,000 before referred to. The difference between Dall's contract price and the sum total paid to him is $31,732.69, while the agreed price to complete is $35,961.74, an excess of $4,229.05. The defendant owner contends that that sum, viz., $35,961.74, is the fair and reasonable cost of completion, and that might obtain but for some facts which must now be considered. It appears that when Dall suspended there was material on the premises; that that material, of the value of $3,000, at least, was used in the building, and that value was considered in the cost of completion. If that be so—and there is no contradiction—then it did not form part of the cost of completion. It had been furnished under Dall's contract, and had been delivered to be used in the construction of the house and stable. Again, it appears that there was paid to the lienors joining in the contract for such completion 38 per cent. of their liens. While I am quite mindful of the attempted contradiction of such testimony, still, taking the testimony of the witness Randall at its true value, I am convinced that such payments were so made. The liens filed aggregated $24,923.47, while those of Meyer and Androvett, who did not join in the contract and received none of the 38 per cent. payment, amounted to $6,981.12. Thirty-eight per cent. of the liens other than those

of Meyer and Androvett amounts to $6,819.09, and that should not be allowed as a part of the reasonable cost of completion. Again, many of the items of the extras, as they appear by the memorandum attached to the contract, had been completed before Meyer was stopped in his work. The testimony leads to the conclusion that the items of the extra work so completed amounted to more than $3,500. The rock excavation, amounting to $1,029.63, had been done by Meyer; also the changing of stonework in piers, $185.02. Of the fireproofing partitions and walls upward of $2,400 had been done and earned. Much more of the extra work had been done. Deducting the value of the materials delivered to Dall and used as above the 38 per cent. paid to lienors and the $3,500 for extra work previously completed from the August, 1902, contract price, we have $23,642.65 remaining, while the sum unearned of the Dall contract over and above the fair value of his completed work, if the architects' certificates truthfully certified to the performance of 85 per cent. "of the value of all labor and materials actually incorporated in the building" and for which amount payments were actually made was $22,475.85. From all the evidence it appears that the reasonable cost of completion, allowing for every consideration, was not greater than $25,000, which, deducted from the sum remaining unpaid on the Dall contract leaves a balance of $6,732.69, to which plaintiff's lien attached.

The lienor Meyer complied with every requirement of the statute, and the lien states all thereby called for. The work was done upon the property as a whole, toward the erection of a gentleman's country house and stable. The original contract was an entirety, and it is of no consequence here that the stable is on a lot not adjoining the lot on which the residence stands, but close thereto. The contract called for the erection of a house and stable at Tuxedo, N. Y.

Meyer had the right to assign his lien or any part of it, conditionally or otherwise. It is a chose in action, and hence the assignee, the bank, is a proper party here.

Judgment for plaintiff.