LYDIA M. HART, Claimant, *v.* STATE OF NEW YORK, Defendant.

(Claim No. 28143.)

Court of Claims, April 21, 1948.

*Judson A. Parsons* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Edward R. Murphy* of counsel), for defendant.

LAMBIASE, J.  Claimant has filed this claim against the State of New York to recover for personal injuries sustained by her on the morning of October 24, 1945, as she was crossing a lift bridge known as the Union Street-Barge Canal Lift Bridge, located over said canal at its intersection with North and South Union Streets in the village of Spencerport, New York, which injuries she claims to have sustained without any negligence on her part and through the negligent operation of said lift bridge by the State, its officers, agents, and employees.

On the day in question at or about ten or eleven o'clock in the forenoon thereof, claimant started across said lift bridge walking in a northerly direction on the east sidewalk thereof. Some time after claimant had started to cross said bridge, it was raised to allow the passage on the canal of three PT boats. As she proceeded across said bridge, she went from the east sidewalk to the west sidewalk thereof, crossing the roadway thereof, and continuing to walk until she reached a point at the northwest corner thereof where she stopped and waited until it eventually was lowered in the manner and according to the procedure hereinafter described.

The lift bridge and its operation were described by claimant's witness Tosh, Section Superintendent of Maintenance and Operation of the Barge Canal, District 4.  We quote from his testimony: " Q. Can you describe the operation of that bridge

at Spencerport? A. The Spencerport lift bridge is an electrically operated bridge and it carries vehicular traffic across the bridge when it is in its normal position and as Canal traffic approaches this bridge within 1,000 feet, they are supposed to whistle a warning to the bridge operator who in turn answers with three blasts of a whistle. I might say that the approaching boat uses the same number of blasts, three, to request the rise of the bridge. Q. That is at a distance of 1,000 feet? A. Yes, sir. Q. Is there a whistle post? A. There is a wooden sign on the righthand side, and the bridge operator then proceeds to raise the bridge. He has certain rules and signals notifying pedestrians and vehicular traffic. There is a large bell similar to an old style farm bell on the bridge. That is first rung and the signals are unusual because there are no other bells of that kind used in traffic that I know of in any area nearby, and when the bridge is cleared of traffic the flagman goes to the center of the roadway and usually at one end of the bridge. It might be at either end according to the conditions of traffic. He puts up a stop sign or red flag to stop the vehicular traffic, and the bridge operator is so located in this tower that he can see pedestrian or vehicular traffic the full length of the bridge and when it is cleared of traffic he lifts the bridge. The bridge comes up around twelve or thirteen feet. Q. When it is cleared of traffic does any gate go down? A. There are no gates going down for the vehicular traffic. Q. And no gate goes down for the sidewalk traffic? A. There is a gate that closes up at the top of the bridge, but when the bridge is raised there is no automatic gate. Q. Would you tell also what happens when the bridge goes down? A. The procedure? * * * The Witness: The operator gives a signal, this bell signal, before starting the bridge down and he operates the bridge through the controller in the bridge tower and the flagman who is on duty at either end of the bridge, he is still protecting the vehicular traffic. By MR. PARSONS: Q. Is he still on the bridge? A. Yes, and the bridge goes on down to the bottom, to the normal position for vehicular traffic. Q. And will you describe what takes place when the bridge is lowered as it approaches the level? A. I don't think of anything unusual. Q. Isn't there also a safety stop? A. There is an automatic cutout on the electrical apparatus when the bridge approaches the seats or the down position of the bridge. They cut in and it lowers rather slowly for the last ten or twelve inches, when it approaches the final position. Q. In fact it comes to a stop when it is a few inches

above the sidewalk level? A. Yes. The speed slows up. Q. And that is known as the safety stop? A. Yes, that is the safety. MR. MURPHY: I move to strike out safety stop. It is just the safety. The Court: The witness says it is known as the safety. The answer may stand as it is. It is known as the safety? The Witness: Yes, sir. * * * Q. Does the slowing down of the bridge as it is lowered at points in which you call a safety, does that occur automatically or does the bridge tender have to take some action? A. That slows up automatically with safety switches. Q. Does he operate the switches? A. No. Q. Are you sure of that? A. He cuts off the power when it reaches that point. Q. He cuts off the power? A. Yes, sir. * * * The Witness: That limit switch cuts in, when the bridge is about ten or twelve inches this limit switch cuts in and it slows up the travel of the bridge considerably, and the operator cuts the power off and the bridge usually drifts with its momentum into the seat. By MR. PARSONS: Q. Mr. Tosh, isn't it true when the power is furnished from the outside that the operator of the bridge has to take some action himself to produce that safety? A. This limit switch cuts in and cuts the power off. It is for a protection for overtravel to the motor and cables. Q. Is an automatic control provided at Spencerport? A. It is a semiautomatic control. The operator has the control on the controllers for operating the motors.''

On the morning in question, the bridge, with claimant on it, had lowered to the point where the cutoff switch had cut in, and the bridge was settling or drifting down on its own momentum. Claimant had taken hold of the railing located at the point where she stood, and as the floor of the bridge was within a few inches from the pavement of the street, she started to step down from the bridge to said pavement. At this point the bridge, instead of continuing in its accustomed routine manner its slow drifting downward course for the remaining few inches necessary to regain its final position even with the highway pavement, and before it had attained said final position, was again started upwards suddenly and without any warning of any kind being given to claimant, as a result of which claimant, who was in the act of stepping off the bridge, was thrown forward therefrom and on to the ground sustaining the injuries hereinafter set forth. The bridge continued on upward for the second time without stopping, this time, however, without the claimant on it; and in due time it was again lowered after the passage on the canal of a fourth PT boat.

Section 120, former section 47, of the Canal Law, at all times in the claim mentioned in pertinent part provided as follows: " There shall be allowed and paid to every person sustaining damages from the canals or from their use or management, or resulting or arising from the neglect or conduct of any officer of the state having charge thereof, or resulting or arising from any accident, or other matter or thing connected with the canals, the amount of such damages to be ascertained and determined by the proper action or proceedings before the court of claims, but no judgment shall be awarded by such court for such damages in any case unless the facts proved therein make out a case which would create a legal liability against the state, were the same established in evidence in a court of justice against an individual or corporation ". Allowance of such claims as provided for by section 120 above quoted was first made by section 1 of chapter 321 of the Laws of 1870. In discussing that section, the court, in *Sipple* v. *State of New York* (99 N. Y. 284, 288) stated: " The object in view was the protection of the citizen, and not the exemption from liability of the State; and it is quite evident that the State thereby intended to assume, with reference to the management of the canals, the same measure of liability incurred by individuals and corporations engaged in similar enterprises, and to afford to parties injured the same redress which they would have against individuals and corporations for similar injuries." (Canal Law, § 120, formerly § 47; *Mohawk Carpet Mills* v. *State of New York,* 296 N. Y. 609.)

We are of the opinion that claimant has established the negligence of the State herein. In fact, we do not think that the State seriously contends that it was not negligent. We do not deem it necessary to dwell upon this phase of the case, that is, the State's negligence, at any greater length.

The State rested its case at the conclusion of claimant's case; and while it made its usual motion to dismiss the claim on the ground that no cause of action had been made out against the State of New York, the principal ground which it urges in its brief to sustain and to support the granting of said motion is that claimant has failed to prove herself free from negligence contributing to the causation of the accident. In fact, the State urges in its brief with much emphasis that " It is utterly inconceivable that any Trier of the Facts — in fairness to the defendant — can hold that Miss Hart's own negligence did not contribute — at least in some degree — to the misfortune which

befell her ". (State's Brief, p. 2.) We are unable to agree with this contention of the State.

Was the claimant negligent under the circumstances herein, and, if so, did her negligence contribute as a proximate cause to the accident and to her injuries? We think not. It is claimed by the State that the fact remains that if the claimant had waited until the bridge was down and had then stepped off, she would not have been hurt. Let us consider this argument insofar as it may have a bearing on the question of claimant's contributory negligence herein.

The care with reference to the matter of contributory negligence required is not to prevent injury to someone else, but to the actor himself. Every person is required to use reasonable care in that regard. In other words, the plaintiff must use for his own protection the care which a reasonably prudent and vigilant man would use under similar circumstances to protect himself from injury. (*Christensen* v. *Hannon, Inc.,* 230 N. Y. 205.) Since a plaintiff is concerned with the duty to use care to protect himself and not someone else, it is obvious, therefore, that he must realize that he is in danger. He must have knowledge of the danger threatening through his acts before he can be required to use care to protect himself. That knowledge may be actual or imputed, but it is an essential in establishing contributory negligence. (*Murphy* v. *Hudson River Tel. Co.,* 196 N. Y. 505.) It is not only the danger which the plaintiff has seen and failed to protect himself against that may render him guilty of contributory negligence. He not only has a duty to use care in the facing of known danger, but he further has a duty to use ordinary care in observing and appreciating danger. (*Hudson* v. *Church of the Holy Trinity,* 250 N. Y. 513.) In other words, he must use the same care in observing danger that a reasonably prudent and vigilant man will use. That is, ordinary care. He is not required to apprehend danger under all conditions, and will not be held guilty of contributory negligence where he failed to observe a danger that he had no reason to apprehend under the circumstances surrounding him at the time. (*Loughrain* v. *Autophone Co.,* 77 App. Div. 542; *Quirk* v. *Siegel-Cooper Co.,* 43 App. Div. 464.)

It seems to us that the question as to claimant's alleged contributory negligence may be stated as follows: Should such an accident as occurred herein have been foreseen and provided against by claimant in the exercise of reasonable care and vigilance? Did claimant, under all the circumstances, fail to use reasonable care for her own protection? We think not.

Claimant lived just a short distance from the bridge. She had crossed it during the course of many years, oftentimes crossing it several times in one day. Always it had been operated as hereinbefore described. The method of operation of the said bridge by the State, its officers and employees, was well known to the claimant and to other users thereof. The failure to continue to follow a voluntary and continued practice which is notoriously public and is well known to an injured party may become an act of negligence for which the party failing to follow such custom would be liable. (*Taddeo* v. *Tilton,* 248 App. Div. 290; *Ernst* v. *Hudson River R. R. Co.,* 39 N. Y. 61; *Perrone* v. *Pennsylvania R. R. Co.,* 136 F. 2d 941; *Elias* v. *Lehigh Valley R. R. Co.,* 226 N. Y. 154) ; and in reaching our conclusion herein as to claimant's contributory negligence, we have laid some stress upon the facts established with reference to the regular routine and practice employed by the State in the operation of said bridge on the day of claimant's accident and for some years prior thereto. We have considered also the effect of said regular routine and practice on the question as to whether or not claimant was misled and lulled into a sense of security by relying upon it — not that that element alone herein would entitle claimant to discard all caution, but as bearing upon the question as to whether the caution she did use, under the circumstances herein, was adequate (*Elias* v. *Lehigh Valley R. R. Co., supra,* and *Perrone* v. *Pennsylvania R. R. Co., supra*) ; and we have not overlooked that '' the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty.'' (*Palsgraf* v. *Long Island R. R. Co.,* 222 App. Div. 166, revd. 248 N. Y. 339, 343, motion for reargument denied 249 N. Y. 511.)

Let us pursue our discussion further. Assuming, but not conceding it to be the fact, that it was negligence on claimant's part to have stepped off said bridge while the same was in the act of drifting back into its final position even with the highway and sidewalk, was it the proximate or a contributing proximate cause of the accident described herein? There is one fundamental rule which has been clearly established in the subject of proximate cause, which is decisive of this case on the question of the claimant's alleged contributory negligence, and that is the one that the act of a party sought to be charged is not to be regarded as a proximate cause unless it is in clear sequence with the result, and unless it could have been reasonably anticipated that the consequences complained of would result from the

alleged wrongful act; that if the consequences were only made possible by the intervening act of a third party which could not have reasonably been anticipated, then the sequential relation between the act and results would not be regarded as so established as to come within the rule of proximate cause. (*Saugerties Bank* v. *Delaware & Hudson Co.*, 236 N. Y. 425, and cases cited therein.) To put it in another way, the proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new cause, produces that event, and without which that event would not have occurred; and the act of one person cannot be said to be the proximate cause of an injury when the act of another person has intervened and directly inflicted it. (*Laidlaw* v. *Sage,* 158 N. Y. 73.)

It is stated in *Martin* v. *Herzog* (228 N. Y. 164, 170): " We must be on our guard, however, against confusing the question of negligence with that of the causal connection between the negligence and the injury. * * * To say that conduct is negligence is not to say that it is always contributory negligence. ' Proof of negligence in the air, so to speak, will not do ' (Pollock Torts [10th ed.], p. 472).'' In our opinion it was the unforeseen and unprecedented action of the State, its officers and employees, in raising the said bridge a second time in the manner hereinbefore detailed that was the intervening act and was the sole proximate cause of the accident.

The State has directed our attention to *Ward* v. *Mayor of the City of New York* (19 App. Div. 48). It is claimed by it that the facts in said case are similar to those in the instant case. We discuss it in some detail. We quote from the court's opinion at page 49 of 19 Appellate Division Reports: '' The evidence shows that the plaintiff, at the time of the happening of this accident, was thirteen years of age * * * and that he and some of his companions were upon the bridge for the purpose of eating their lunch and watching the operations of some workmen who were engaged near the bridge. There was evidence from which a jury might find that the bridge was not in proper repair. It also appeared that the plaintiff and his companions were accustomed frequently to cross the bridge in question, and that he was familiar with its management and the method by which it was operated. Taking that view of the evidence most favorable to the plaintiff, it appears that the boys were standing in the center of the draw at the time the signal was given for vehicles and pedestrians to get off the draw as it was about to open and let a boat pass. They then commenced to walk towards

the end of the bridge, and, while so walking, the bridge opened and their exit from the draw was cut off. There were no fences or barriers at the end of the draw, but there were upon the abutments. While the draw was being opened the boys stood within two feet or two and a half feet from the end of the draw. As it came back there was a *considerable concussion,* they were thrown down and the plaintiff in some way, which is not clearly explained, caught his leg between the draw and the abutment and was injured.

"Under these circumstances it would seem that the conclusion is irresistible that the plaintiff was guilty of contributory negligence in remaining so near to the end of the draw while open, when he knew that it was about to be closed. *He was familiar with the working of the bridge, and knew that such closing would result in a considerable shock.* He was in such proximity to the edge of the draw that but a step would place him in danger, but he does not seem to have taken any precautions whatever to avoid the peril which was apparent." (Emphasis supplied.) An examination of the record in the *Ward* case (*supra*) indicates that the bridge involved was a draw bridge which had a span which when operated swung open to permit the passage of boats. This span sagged a matter of inches at its landward end, and because of defective parts, customarily closed with a noticeable jar when coming back to its normal position against the abutment. The span bounced up as it struck against certain metal plates installed on said abutment. It was described as bouncing twice as it passed along and over said plates before coming to rest in its final position. This customary and noticeable jarring was its usual and customary way of settling back into its final and closed position. The bridge had functioned in this manner for some time, and plaintiff knew and was acquainted with its operation by reason of having been on it many times before when it had closed in precisely that same manner. The point which distinguishes the *Ward* case from the instant case is that in the former the bridge, in jarring and in bouncing, and in causing the "considerable concussion" mentioned by the court in its opinion, was doing exactly what it always had done, while in the instant case *the bridge did not do (on the occasion of claimant's accident) what it customarily did.* Rather, it did the unusual, unaccustomed, and unprecedented thing when it did not drift slowly back into place but was unexpectedly started up again without warning to the claimant and before permitting

it to attain its final position even with the pavement. In the *Ward* case, plaintiff knew what to expect; in the instant case, claimant had been led to rely on what to expect only to have the unexpected happen. It is obvious that the *Ward* case is distinguishable from the instant case, and we so hold.

We conclude, therefore, that there was no negligence on the part of claimant which was the proximate cause of or which contributed as a concurring proximate cause to the accident from which resulted claimant's injuries.

Certain rules and regulations governing navigation on the New York State canal system were offered in evidence by claimant, and were admitted over the objection of the State with the reservation, however, that they might be struck out if we later determined them to be incompetent. (Claimant's Ex. 23, regulations Nos. 20, 27, 38, 40, 41, subds. a, f.) The preamble to said rules and regulations (Claimant's Ex. 23, p. 5), states that: " All parties engaged in the operation of floats on the canals of this State are required to familiarize themselves with these rules and regulations and to be guided by them at all times. Ignorance of rules and regulations will not be accepted as an excuse for their violation." (2 N. Y. Official Compilation of Codes, Rules & Regulations, p. 1068.)

The making and promulgation of these rules and regulations is prescribed by law. (Canal Law, § 86; *Hydraulic Race Co.* v. *Greene,* 230 App. Div. 374, 381, affd. 257 N. Y. 540; *United States* v. *Grimaud,* 220 U. S. 506); and legislative and constitutional provision is made for their filing in the office of the Department of State. (Canal Law, § 86; N. Y. Const., art. IV, § 8.) Furthermore, we may now by statute, in our discretion, take judicial notice of said rules and regulations (Civ. Prac. Act, § 344-a, subd. 4, added by L. 1943, ch. 536, eff. Sept. 1, 1943), and proof thereof may be made pursuant to section 382 of the Civil Practice Act.

It is contended by the State that since they are departmental rules and regulations, they are not competent evidence herein against the State. We are unable to sustain the State's objection on that particular ground. (*Wood* v. *American Locomotive Co.,* 250 App. Div. 816; *Slattery* v. *Parsons,* 17 N. Y. S. 2d 6; *Kiernan* v. *State of New York,* 191 Misc. 505; *Hydraulic Race Co.* v. *Greene,* 230 App. Div. 374, 381, affd. 257 N. Y. 540, *supra*; *Perrone* v. *Pennsylvania R. R. Co.,* 136 F. 2d 941, 943, *supra*.) We strike out regulations 20, 38, 40, and subdivisions a and f of regulation 41, however, upon another ground, viz., that it

appears from an examination of said regulations that they have, in our opinion, no bearing upon or relation to claimant's accident, and, for that reason, are not competent evidence. We do not strike out regulation 27 as, in our judgment, it may have some bearing upon and relevancy to claimant's accident. We have discussed this matter of rules and regulations in some detail herein, although we are satisfied that there is ample evidence in the record to sustain our findings herein exclusive of them.

There remains but for us to discuss the question of claimant's injuries. This accident occurred on October 24, 1945, just fifteen days before claimant became sixty-eight years of age. Claimant is unmarried, and had worked for many years, although it does not appear in the record that she had worked since 1935. She was living at the time of the accident with her sister in the village of Spencerport, New York. Her injuries are serious consisting of a fracture of the right tibia within the knee joint, necessitating the application of a cast which was applied the day following the accident. Claimant was transferred by ambulance to a convalescent home in the village of Spencerport, New York, where she stayed until January 19, 1946, when she was taken to her home in said village where she then resided with her sister. The cast remained on claimant's leg for one month after which attempts were made to mobilize the knee and to get the knee to function. There was gradual improvement, so that by January 7, 1946, she was able to walk slowly and somewhat painfully supporting herself with the aid of the back of a chair. Later she was able to walk awkwardly with the use of a cane. There is a permanent restriction of the movement of the knee joint which has resulted by reason of the accident, and the injuries sustained herein. Claimant's leg cannot be straightened fully, there being an angle of 170 degrees formed when she straightens it as far as it will go compared with the normal straightening of the knee which forms an angle of 180 degrees. The flexion of the knee can be accomplished only up to an angle of 100 degrees. She has had much pain and suffering as the result of said knee injury, and at the time of the trial still complained of frequent pain and aching in the knee, front and back, particularly during storms and damp weather, said pains coming on at irregular intervals. She is unable to take care of herself by reason of the injuries herein described, and will require attention in that respect for the rest of her life. Claimant was very much con-

fused and nervous immediately following the accident although most of that trouble had disappeared and cleared up at the time of the trial; that there was interference or irregularity of her personal functions for the first two weeks after her injury, but that that had also improved so that at the time of the trial there was only an occasional irregularity in that respect. Claimant will be incapable of engaging in any gainful occupation or of supporting herself. She will continue in the future to undergo pain and suffering by reason of said injuries. She has incurred medical, nursing, and hospital expense since the date of the accident and will continue to incur such expense for some time in the future, the exact duration or extent of which cannot be ascertained with any degree of reasonable certainty at this time.

We conclude, therefore, that the negligence of the State of New York, its officers and employees, was the sole proximate cause of the accident herein described which caused the injuries of which claimant complains, and that there was no negligence on the part of the claimant contributing to or concurring in the happening thereof as a proximate cause. Claimant, therefore, is entitled to recover against the State of New York.

We are, therefore, in an accompanying decision making an award to the claimant in an amount which we feel adequately compensates her for the damages sustained by her.