Alexander Del Giorno, J.
This claim came on for trial before me on the 8th and 9th days of April, 1957. The action is one for personal injuries sustained by the claimant while driving his automobile on the Loop Bascule Bridge, a part of Meadowbrook Parkway and a State highway leading to Jones Beach State Park.
The accident occurred August 14, 1954, about 5:00 p.m. The claim herein was filed November 12, 1954. The claim has not been assigned. The plaintiff testified that he was driving at *1065 that time from Flushing, Queens County, to Point Lookout, Nassau County, to his job.
Sketches, photographs in evidence, and the testimony indicated that Meadowbrook Parkway is covered with macadam, that both ends of the bridge have a concrete pavement. The draw leaves in the center were covered with wooden planks which were themselves covered with a dull oily substance. State’s Exhibit J in evidence indicates that at the easterly approach to the bridge there was a sign to the right of the road which read, “ Caution — Draw Bridge. STOP on Bed Light.” By measurement, this sign was 55 feet ahead of a flickering red „ light set on a pole also on the right side of the road and a few feet from the road bed. In line with the first pole and 123 feet past it, there was another pole which was located at the beginning of the easterly concrete pavement of the bridge. On this pole there was a traffic light and a bell which were controlled from the operation tower on the bridge. There was a corresponding pole and installation at the other side of the bridge approach.
The concrete part of the easterly half of the bridge was 300 feet long and the leaf on the same side was 40 feet long. The westerly half had the same dimensions.
The claimant testified that he had been traveling at 40 miles per hour until he reached the caution sign, when he slowed down to a speed of between 30 and 35 miles per hour. He looked at the traffic light and was alert for the sound of the bell, both of which he knew were there because he had been over the same route on many previous occasions.
Claimant asserts he did not see the traffic light in operation, nor did he hear the bell until after his " car had entered the bridge roadway proper.
On hearing the bell, he looked at the tower, saw the tower man and was expecting a signal either to stop or proceed. He received none. He assumed that since he was on the bridge he could continue. He shifted his car to second speed at about 25 to 30 miles per hour and went on. When he was about 20 feet from the end of the easterly concrete pavement he saw the bridge starting to open. He applied his brakes but the wooden pavement did not hold his car and he went on for about 50 feet on the asphalt blocks. There his car hit the rising leaf which now was open enough to strike at about the bumper of the automobile.
The claimant was driving a 1950 model Mercury sedan on which three weeks before had been installed new tires and new brakes. An expert witness testified that before the accident *1066 the car was worth between $850 to $900, and that the damage which consisted of the entire front being pushed back was $560. The car had to be towed away from the scene of the accident.
The claimant stated that he was taken to his doctor’s office that evening. He was examined and given an injection to ease the pain. Dr. Maillard stated that he saw the defendant on August 14, 1954, at his office, and upon examination found contusion of the sternum, the anterior chest wall and the left knee.
An X ray taken the next day was negative. He saw the defendant 14 times, the last time being October 20, 1954. The treatment consisted generally of diathermy and injections.
The doctor added that he saw claimant on February 16, 1955, when he complained of a pain in the left knee. An X ray indicated defendant now had bursitis of the left knee. He drained the bursitis and gave the claimant seven short-wave treatments which ended April 11, 1955. The doctor asserted that the bursitis is of a permanent nature and that it can be attributable to the accident either entirely or, if in existence before, as an aggravating circumstance thereof. He stated, too, that it is not unusual for traumatic arthritis to appear six months after an accident. He stated that the fair value of his services was $125, the X rays were some $30 and medicines between $20 and $30.
The claimant stated he was earning then $100 weekly salary, and that he lost two weeks from work. He previously had testified to the injuries and treatment referred to in Dr. Maillard’s testimony.
For its part the State produced Mr. John A. Carle, assistant superintendent of Jones Beach State Park. He is acquainted with the operation and control of the bridge. He operated the control tower during the last war. He stated that the operator in the tower knows that the green light is always on. He enumerated the steps which should be taken by the operator of the tower before the bridge is opened, namely: 1. To look for traffic on and approaching the bridge. 2. To push the knob which turns red traffic light on and rings the bell simultaneously.
3. To withdraw locking bars. This takes 10 to 15 seconds and puts leaves in condition to open. 4. To raise leaves when bridge is clear. He stated that when the light changes to red it is not visible from the tower; that there are no traffic lights on the whole span of the bridge and that there is only one warning sign about 300 feet before one reaches the bridge from the east.
On cross-examination he asserted that it is the duty of the operator to continue watching and make sure there are no cars *1067 on the bridge before he starts opening the draw. He stated that he would not open the leaves if he saw a car passing by the warning sign.
Charles Bauh, the bridge tender, testified he had operated the bridge tower for two years before the accident. He saw defendant’s automobile about a quarter of a mile away. He also saw boats approaching. He put on the traffic lights and bell. The car was still beyond the lights. He started to draw the bridge and, as he turned, he heard the screeching of brakes, at which time he stopped raising the bridge which was now two feet above normal level. He conceded further that at the controls he faced west, away from the claimant. He said that he could not have opened the bridge unless he pressed the light and bell button first which also activates the blinker light. On cross-examination he said that under ordinary circumstances he would not have opened the bridge except that the current was strong and boats were waiting.
Two sergeants of the State troopers who had been called to the scene of the accident made a thorough investigation. One of them took photographs of the scene and of claimant’s car. These show the exterior damage. They measured skid and tire marks of claimant’s car which measured 78 feet. They tested the bridge operation and found it normal. They found the lights operated properly. They found the bridge open only four to five inches.
At the end of the case claimant moved to conform the pleadings to the proof, as to the personal injuries. There was no objection. The minutes were waived by both sides.
The judgment is rendered against the State. We shall concede that the machinery controlling the operation of the lights, bell and draw was in good working condition. After hearing all the testimony herein and having given due deliberation to all the facts submitted, the court concludes that this accident was due solely to the failure of the man in the operation of the bridge tower.
The claimant was traveling at a proper speed. We are satisfied that he had passed the lights before they went on. Even so, he slowed down because he sensed caution was required when he heard the bell ringing. He awaited a signal from the operator of the control tower, since that was the only way to ascertain, while he was upon the bridge, whether to proceed or to stop. The bridge tender saw him but did nothing except to open the bridge, despite the fact that he knew the claimant was upon it. The claimant thereby was lulled into a sense of security, and proceeded, as any reasonable person would do *1068 under the circumstances. Further, any reasonable person in that position, hearing the bell and receiving no word or signal of caution, would hasten to leave the bridge in order that it might be opened immediately after he had crossed it.
We are of the opinion that the claimant has established the negligence of the State herein, and that he was not negligent under the circumstances and is not guilty of contributory negligence. The claimant must use for his own protection the care which a reasonably prudent and vigilant man would use under similar circumstances to protect himself from injury. (Christensen v. James S. Hannon, Inc. 230 N. Y. 205.) “ He must use the same care in observing danger that a reasonably prudent and vigilant man will use. That is, ordinary care. He is not required to appréhend danger under all conditions, and will not be held guilty of contributory negligence where he failed to observe a danger that he had no reason to apprehend under the circumstances surrounding him at the time.” (Hart v. State of New York, 192 Misc. 492, 497, citing Loughrain v. Autophone Co., 77 App. Div. 542, and Quirk v. Siegel-Cooper Co., 43 App. Div. 464.)
The accident which occurred herein could not have been foreseen and provided against by the claimant in the exercise of reasonable care and vigilance, and claimant used reasonable care for his own protection. (Hart v. State of New York, supra.)
The court concludes that the negligence of the State was the sole proximate cause of the accident herein and that there was no negligence on the part of the claimant contributing to or concurring in the happening thereof as a proximate cause.
We award the claimant $200 for loss of earnings, $400 for damages to the claimant’s automobile, $150 for medical services and expenses, and $2,000 for personal injuries sustained by him. The court has passed upon the findings submitted by the claimant and the State.
This memorandum constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.