Alexander Del Gtorno, J.
This is a claim by Anna Mondore to recover damages for personal injuries sustained by her as a result of the alleged negligence of the State and by her husband Herbert Mondore to recover for medical expenses and loss of services.
The claimant Anna Mondore, a housewife, testified that on June 25, 1955, she went on a bus ride with her mother and two children to Hempstead Lake Park with a group of parishioners of the Methodist Memorial Church located on Sheridan Avenue, Brooklyn. Arriving there at about 11:00 a.m., she went into the picnic grounds, noticing a carousel which was shuttered at the time. After lunch, the carousel was opened and she bought two tickets and placed her children on the carousel, after which she sat down with her mother. She then bought two more tickets before the completion of their ride and approached the carousel in order to give the tickets to the operator. Upon returning to her seat on a bench, when she had reached a point about six feet from the carousel, and while wearing low shoes with low heels, she claims to have slipped on a mass of oil, water and grease about three to four feet in width and from six to eight feet in length, coming from underneath the carousel. She fell on her back, was unable to rise, and was removed by ambulance to Meadowbrook Hospital. She was aware of the fact there was a yellow safety lane about three to four feet from the carousel, extending around the perimeter of the carousel. Her mother, Marie Neumann, testified that claimant fell outside the yellow safety line. The mother admitted that she had seen the ‘ ‘ water ’ ’ *14 which extended from the carousel before the time her daughter fell, but had made no mention of it to anyone. The witness Rev. Wesley Sheffield, an ordained Methodist minister, who accompanied the expedition to the State park, testified that he saw some small puddles of water about five feet from the carousel and observed water within a few feet of where claimant was lying on the apron around the carousel. When claimant was removed to the hospital, he accompanied her. He did not see the accident happen, but was called io the scene after its occurrence. Both claimant and the State agree that on the day prior to the accident it had rained.
Herbert Mondore testified that he expended on behalf of his wife the sum of $90 for doctor’s bills, $15 for medical supplies and $57.50 for hospital bills, the total sum being $162.50.
State’s witness Keyes, foreman of labor at the park on the day in question, testified that there were three employees assigned to the carousel; that the carousel was well lit by over 200 lights, that the apron was lit by a spotlight and that there was an abundance of natural light. He stated that it was the custom of employee Campbell to start work on weekends at 8:00 a.m., at which time he opened the shutters, then swept the premises and then wiped off the arms of the horses. After about three hours, he closed the carousel, went to lunch and reopened at about 11:30 a.m. The witness said that on the day of the accident he opened the doors and examined the carousel for grease and dirt, finding no water and no grease on the apron of the carousel. He stated that the duty of employee Kaller was to keep the area around the carousel clean and to help keep people back of the yellow line, on which there is a sign “ Keep out while in motion ”. Examining the area after claimant’s fall, he stated he found nothing, but he admitted that the area could have been cleared after the occurrence of the accident and before his arrival on the scene. He said that although he observed no water, it would have been possible for rain water to go underneath the doors and onto the floor, but that grease could not have run from the machinery to the floor because of protective devices in use.
State’s witness Campbell testified that on the day of the accident he cleaned the area and the carousel, sweeping all around, brushing with a long-handled broom under the carousel and checking the operation of the carousel. His duties further were to start and stop the carousel. Observing the concrete apron, he saw upon it no water and no oil. While in the process of stopping the carousel, he saw the claimant upon the ground, *15 next to the outer rink of the carousel. He said that while she was lying on the floor, claimant’s hand was extended toward one of the carousel poles, and that he saw no water or grease in the vicinity.
After her removal to Meadowbrook Hospital, claimant remained there for four or five hours and X rays were taken. She was then taken home in a car by her husband and a neighbor. She remained in bed for two weeks, and was confined to her home for two months, during which time her mother helped her. She claims that the pain continues to this day, particularly during the menstrual period and immediately preceding and subsequent to such period, also in bad weather and when she walks a great deal. After having been treated first by Dr. Gorlin, she then submitted herself to the care of Dr. Grayson who examined claimant first on August 17, 1955 and found that she suffered severe pain in the back and spine and that she could not bend; he found also that the area in the vicinity of the coccyx was painful. He caused X rays to be taken on August 19, 1955, one of the coccyx area (claimant’s Exhibit 5), one of the pelvic area (claimant’s Exhibit 6), and a spot plate of the coccyx area (claimant’s Exhibit 7). He testified that the first X ray indicated a com-minuted fracture of the coccyx bone, and that there was a fragment not united to the main bone. It was his opinion that the situation was a sensitive one, the patient being obliged to sit on the side of one buttock, and that it is impossible to designate a time of recovery; if the pain persists, he might recommend removal of the coccyx. He testified that the injury is permanent. On cross-examination, he stated that the X ray report of the hospital indicated there was no fracture.
On behalf of the State, Dr. Foege, radiologist, testified that on November 22, 1957, at the request of Dr. Sansone, State’s expert, he took X rays of claimant. He reported that there was no abnormality of the coccyx and that the two segments are in normal alignment. Reading the X rays taken at the request of Dr. Grayson he stated that there was a line across the lower end of the coccyx which could be interpreted as a fracture, but that this is not necessarily so. He stated further that any evidence of fracture in claimant’s Exhibit 5 is not visible in claimant’s Exhibit 7. Referring to the X ray of the pelvic area (claimant’s Exhibit 6), he stated that he saw a separation in the terminal segment which was suggestive of a joint rather than a fracture line. It was his opinion that there was no fracture, after an examination of the claimant’s X rays and those taken by the State.
*16 State’s witness Dr. Sansone testified that he examined claimant on November 22,1957, that was his opinion that she sustained a severe contusion of the buttock, and he maintained that his finding was sustained by the X rays of Dr. Foege. He stated claimant could have been incapacitated for some weeks and agreed that an injury to the coccyx is very painful. He testified that there definitely was no fracture.
The State, while not an insurer of the safety of the public using its parks, is required to use reasonable care toward the public and to keep its parks in a reasonably safe condition. Claimant has established to the satisfaction of the court the existence of an accumulation of oil, water and/or grease upon the floor about six feet from the carousel, and that she slipped upon it while approaching the carousel. Her testimony is corroborated by her mother, who stated that she had seen this mass prior to the time the claimant fell, and by Eev. Sheffield, a Methodist minister accompanying the church party to the park, who stated that when he was called to the scene of the accident immediately after its occurrence he saw small puddles of water a short distance from the carousel and within a few feet of the spot where the claimant was lying upon the apron around the carousel. State’s witness Keyes testified as to his usual procedure while on duty as foreman of labor at the park and said that when he was called to the scene after the occurrence of the accident, he found nothing. He could not state definitely that there was nothing on the floor at the time of claimant’s fall, and admitted that there could have been water which had been cleaned up after the fall and prior to his arrival. He said that although he observed no water when he did arrive, it would have been possible for some water to go underneath the doors and onto the floor, but that grease could not be present.
State’s witness Campbell stated there was no water and no oil on the concrete apron, as he observed it while starting and stopping the carousel. He said that claimant’s hand, as she was lying- on the floor, was extended toward one of the poles of the carousel. No inference may be drawn from this statement, for even if claimant fell while approaching the carousel, her hand might reasonably be found to be extended in that direction.
So far as the question of notice to the State of the existing condition is concerned, the court finds that the State had at least constructive notice of the existing condition. The circumstances of a given case determine the sufficiency of notice. There is involved in the instant case a park area frequented by large *17 numbers of the public. The particular area involved, i.e., the carousel, is one which is used a great deal by the public, especially children accompanied by their parents or guardians. It is the duty of the State to see to it that at all times the area is in a reasonably safe condition. Claimant through the witness Mrs. Neumann, her mother, has shown that the condition complained of was present upon arrival, and that she and her mother and children were present for about 20 minutes before the accident occurred.
With respect to the extent of the injuries suffered by the claimant, careful consideration has been given to the testimony of claimant’s medical expert and the State’s experts. There is an absolute conflict as to the existence of a fracture. Claimant’s medical expert Dr. Grayson emphatically stated there was a comminuted fracture of the coccyx; on the other hand, State’s radiologist Dr. Foege and medical expert Dr. Sansone both declared that there was no fracture. After considering the testimony and examining the X rays, the court finds that no fracture of the coccyx existed.
The claimant has established the negligence of the State herein and that she was not guilty of contributory negligence. The claimant must use for her own protection the care which a reasonably prudent and vigilant man would use under similar circumstances to protect herself from injury (Christensen v. James S. Hannon, Inc., 230 N. Y. 205). “ [H]e must use the same care in observing danger that a reasonably prudent and vigilant man will use. That is, ordinary care. He is not required to apprehend danger under all conditions, and will not be held guilty of contributory negligence where he failed to observe a danger that he had no reason to apprehend under the circumstances surrounding him at the time.” (Hart v. State of New York, 192 Misc. 492, citing Loughrain v. Autophone Co., 77 App. Div. 542 and Quirk v. Siegel-Cooper Co., 43 App. Div. 464.)
The court concludes that the negligence of the State was the sole proximate cause of the accident herein and that there was no negligence on the part of the claimant contributing to or concurring in the happening thereof as a proximate cause.
The court awards the claimant Anna Mondore the sum of $1,000 for personal injuries sustained by her. The claimant Herbert Mondore is awarded the sum of $162.50 for medical services and expenses and the sum of $200 for loss of services of his wife, making a total of $362.50. The court has passed upon the findings submitted by the claimants and the State.
*18 All motions heretofore made by the defendant are hereby denied.
This constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.