374

HYDRAULIC RACE COMPANY, Appellant, *v.* FREDERICK STUART GREENE, Individually and as Superintendent of Public Works of the State of New York, and Another, Respondents, Impleaded with LOCKPORT LIGHT, HEAT AND POWER COMPANY and Others, Defendants.*

Third Department, September 26, 1930.

* Revg. 133 Misc. 410.

*Killeen & Sweeney* [*Henry W. Killeen, Warren Tubbs* and *Francis J. Maloney* of counsel], for the appellant.

*Hamilton Ward, Attorney-General* [*Paul Shipman Andrews, Special Assistant Attorney-General,* of counsel], for the respondents.

VAN KIRK, P. J. This action is brought to have determined to what extent the plaintiff, as lessee of the State, has the right to use the waters of the Erie Canal at Lockport and to restrain the Superintendent of Public Works from interfering with plaintiff's use according to its rights.

The lease, made in 1826, granted " all the surplus waters, which, without injury to navigation, or security of the canal, may be spared from the canal " at Lockport; and reserves the right to " limit, control or wholly resume the said waters, and all the rights granted by this lease, whenever, in the opinion of the said Canal Commissioners, or of the Legislature, the safety of the canal or its appendages, or the necessary supply of water for the navigation of the canal shall render such limitation, control or resumption necessary."

The lower court has found that this is a valid lease and its term is perpetual, but has also found that " Neither plaintiff nor its sub-grantees has any right in law or equity to receive any waters from the State's canal at Lockport in excess of the 109.11 c. f. s. which was surplus from the original Erie Canal." To this finding plaintiff duly excepted; and contends that the lease was of all the surplus water at the Lockport locks at all times during the life of the perpetual lease, subject only to the reservations named in the lease.

In respect to this lease the State acts as a proprietor, as a lessor of water not used for navigation. In the lease nothing is granted which is necessary for navigation. Save for the needs of navigation the lease of all the surplus is absolute and unrestricted and save for such need the State may not resume the surplus waters. So we have a business transaction between the State and another. The State has power to contract and " must be governed by the same rules of common honesty and justice which bind individuals." (*People ex rel. Graves* v. *Sohmer,* 207 N. Y. 450, 457.) When the State's contract " ' comes before the courts, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged in the dealer, contractor and suitor.' " (*People ex rel. Graves* v. *Sohmer, supra,* 458; *People* v. *Stephens,* 71 N. Y. 550.) The rules of construction which apply between persons apply to the State. (*Louisi-*

*ana* v. *Jumel*, 107 U. S. 711.) " 'The words used should be construed in their most natural and obvious sense and * * * whatever is essential to the enjoyment of the thing granted will be necessarily implied in the grant.' " When the grant is as proprietor and " ' upon a valuable consideration [it] shall be construed favorably to the patentee for the honor of the King.' " (*Langdon* v. *Mayor, etc., of City of N. Y.*, 93 N. Y. 129, 145, 146.) The contrary rule applies to gratuitous grants made at the solicitation of the grantee. (Id.) The court must, so far as possible, ascertain the mutual intent of the parties and give effect thereto rather than to particular words which, while used to express that intent, in fact occasion uncertainty. To this end the conditions of the time, the purposes of the parties and the interests involved are to be considered. (13 C. J. 521, § 482; *Smith* v. *Kerr*, 108 N. Y. 31, 37.)

When this lease was made a system of canals was contemplated; water transportation across the State was to be furnished and that not alone to the scanty population then west of the Hudson river, but to the growing population which it was believed water transportation would encourage. They were looking to the future more than the present. What did the State have to dispose of to accomplish its purpose? It had the Erie Canal full of water in the upper level west from Lockport; it had the lower level east from Lockport to Rochester without water. This want must be supplied with water from Lake Erie through the canal west of Lockport. At Lockport were canal locks from the upper to the lower level; but a very small part of the water necessary for the lower level could be passed through the locks without injury to them and to navigation. Thus conduits outside the canal and around the locks were necessary. Here entered the thought of leasing. By leasing the State could gain some income and, at the same time, could shift to another the expense of constructing and maintaining the necessary conduits. But these were the minor considerations; more important was it that vacant lands would be occupied and improved by a thrifty people; that industries would be multiplied to meet growing needs; that increased tolls on the canal would be received; that increased taxes would be collected upon the properties constructed and lands improved. The State's purpose was the same as that which induced it to sell thousands of acres, which had been donated in aid of the canal construction, at a few cents per acre. The rent reserved is a trifling item among the advantages the State expected to gain. And what did the bidder for the lease see ahead? He saw undeveloped water power; to him the rental was a small part of the expense which he must incur to get a return. The conduits would cost considerable sums;

but the conduits without mills and machinery were waste; these must be constructed. Thus was required the expenditure of large sums of money. The bidder was entering upon an adventure which could result in profit in a distant future only. He, too, expected growing industries supplied with water from a canal improved and enlarged to meet the needs of a growing population; he intended to provide for these and to use the increasing surplus of water therefor.

We of course cannot cite the many documents in the record which disclose the inducements which actuated the State and the bidder. But we get a glimpse from a report of the Canal Commissioners to the Assembly in January, 1825, in part as follows: " The utmost reach of human sagacity cannot foresee the variations that may hereafter take place in the supply, nor perhaps calculate the quantity, which the future use of the canals, increased as it necessarily must be, will demand. Water privileges should be granted subject to the wants of the canals, with the right of resumption whenever the public good may be adjudged to require it. It is quite evident that the value of these grants will correspond with the extent of the privileges to be enjoyed under them. Without the prospect of a constant supply of water, and for a considerable length of time, no one will think of using it to put in operation costly or extensively useful works. It is, therefore, proper that the grants to be made, should be for as constant a supply of water, and for as long a time as can be safely given, without exposing the future navigation of the canals to any interruption or inconvenience." (See 2 Laws, etc., Relating to Erie and Champlain canals [1825], 308.) Again, in the report of the Commissioners made in March, 1825, is this: " With respect to the greatest amount of transportation, of which the Erie canal is capable, it may not be amiss to submit a few observations; because, although its capacity in this respect, is much greater than is generally believed, yet the time will arrive within the present century, when it will be entirely incapable of satisfying the multiplied demands of a great and increasing community." (Id. 268.) The Governor of the State expressed views to like effect in messages and letters. Thus was foreseen increases in the capacity of the canal, increased quantities of surplus waters and the necessity for perpetual leases thereof.

We turn then to more direct consideration of the lease. It was authorized by chapter 275 of the Laws of 1825, which contains this: " That whenever, in the opinion of the Canal Commissioners, any water may be spared from either the Erie or Champlain Canal, * * * without injury to the navigation or safety thereof, in such case the Canal Commissioners are authorised to lease the

said waters to such person or persons as may be willing to give the highest annual rent therefor, reserving, however, in the lease to be given, the right to limit, control or wholly resume the said waters, and all the rights granted by any such lease, whenever, in the opinion of said Commissioners, or of the Legislature, the safety of such canals or works, or the necessary supply of water for the navigation of any canal which now is or hereafter may be constructed by the authority of the State, render such limitation, control or resumption necessary." It has never been questioned, prior to this action, that the lease of January, 1826, was fully authorized by this act. Under it the Canal Commissioners advertised for bids, describing to bidders what waters the State purposed to lease. Bids were made and the highest bid was accepted. Thereupon the lease was drawn, probably by representatives of the State, and undoubtedly in accord with the terms advertised as then understood.

This statute provides that "whenever" there is a surplus of water in the canal at Lockport, it may be leased. Such time came; there was a surplus. It was certain, due to the conditions existing there, that, so long as the canal was used, there would be this surplus at the Lockport locks. The State leased all this surplus without limitation for time and without measure for quantity. This was consistent with the conditions and the purposes of the parties. The surplus at the locks is a unit, one thing not many things. When the surplus grows it is still the single surplus, not several surplusses. If a man buys a sapling and keeps it growing, he will own the mature tree. This is an inadequate illustration, but it suggests our meaning. Because a surplus has grown to twice its original size, it has not thereby become two surplusses. We think it plain that the State intended to lease and the lessee intended to take the surplus at the Lockport locks perpetually expecting that it must grow in quantity. It is a mistake to magnify the importance of the word "whenever" used in the statute. It does not suggest that, as the surplus increases, it may be cut into parts and the amputated parts separately leased. The "whenever" day came and this perpetual lease was made. Thereafter, as to this surplus, another "whenever" day would never come. Nor is too great significance to be given to the word "all." A lease of a thing is the lease of the whole thing, not a part of it. Without the word "all" the lease would be of all the surplus, subject only to the reservations. The word "all" perhaps emphasizes the intent to lease the surplus at Lockport without limit of time or measure of quantity. The quantity or size will vary, but the thing will be constant. We must hold in mind that only a minor

part of the water in the upper level which must be passed to the lower level at Lockport could be passed through the locks. Of 125 cubic feet per second available in the upper level in 1826, 109 cubic feet per second had to be by-passed. Had there been any intent on the part of the State to limit the surplus water conveyed to the amount that then existed, it would have been so expressed. The State of course did not intend to deceive the bidders with a phantom lure. We are not justified in interpolating words which parties to the lease did not use and so far as the evidence shows never intended to use. In the light of the existing conditions and the intent of the parties, the wording of the grant seems plain. It expresses with exactness that which the conditions, the purposes and the interests of the parties naturally demanded.

It is not disclosed in the record, but is a fact in hydraulics that 109 cubic feet per second under a 50-foot head will give a theoretical horse power of 617.6. Under the most modern equipment this theoretical horse power will give eighty per cent, or even ninety per cent, effective power. Probably in the year 1825, with the equipment then available, it would give not to exceed fifty per cent effective power. It is impossible to believe that the lessees and their sublessees would have expended the large sums of money put into these properties if they had the right to use but 109 cubic feet per second; nor is it conceivable that the State so understood the lease. To accept the construction that the lease covered only the surplus waters at Lockport in the quantity the Canal Commissioners in 1825 estimated, in our view, is not only in disregard of the actual words of the contract, but is in disregard of what both parties understood the contract to mean as disclosed by one hundred years of open and notorious use by one party and permission to use by the other.

The acts of the Legislature and of the Canal Commissioners confirm this understanding of the lease. In 1838 an enlargement of the canal was undertaken. An increased quantity of water began to pass through the canal in 1842 and the work at Lockport was completed so that the full quantity of water contemplated was passing in 1858 or 1859. To by-pass this water additional conduits had to be made, and the lessees constructed a large tunnel through rock, thus having conduits on both sides of the canal. The water in both was connected up, through flumes, with the plants of the hydraulic company and its lessees and since then the increased quantity of water, some 415 cubic feet per second, has been used by this plaintiff with the knowledge of the Legislature and the Canal Commissioners. The conduits are in part at least upon State lands which were under the control of the Canal Com-

missioners and the Legislature. In or about 1858 this plaintiff took over or was about to take over the lease. Apparently it wanted assurance of its rights in the future. At any rate, the Legislature, by chapter 42 of the Laws of 1858, authorized the Lockport Hydraulic Company to purchase and hold real estate contiguous to the mill race which said company may hereafter construct on the Erie canal, and provided that " it shall be lawful for said company to dispose of any of its real estate and *rights of water* to other corporations or individuals, for manufacturing purposes, by grant or lease; and all such grants and leases shall have the same legal force and effect as if made to a natural person, by an individual owner seized in fee simple; * * *." It was further provided that, in lieu of the yearly rent now payable on this perpetual lease, a lump sum could be paid.

This is an act of the Legislature, a body which speaks for the sovereign State. The Legislature may ratify a contract though originally unauthorized. Such ratification need not be in direct terms; it " may be effected by legislation recognizing the contract as valid." (36 Cyc. 879.) The intent and effect of this act are too plain to pass over lightly; it not only declares that the lease of 1826 is perpetual, but it also grants the plaintiff authority to dispose of its water rights. The plaintiff had no water rights other than those at Lockport under its lease; this act distinctly recognizes those rights; it declares that leases by plaintiff of water rights to others shall have the same effect as if *granted by an individual owner seized in fee simple*. This act was passed after the full amount of surplus water then in the canal at Lockport was known and was being used. It assured the lessee that further developments to use the increased amount of water could be constructed safely; it encouraged men to make such developments. The State of New York did not intend to mislead these people, to encourage them to invest large sums of money in anticipation of using a quantity of water to which they had no legal right; such a contention is unwarranted. And further, sixty years later, in 1918, it was necessary, after the enlargement for the Barge Canal development, to lower the bottoms of the conduits around these locks. The then Superintendent of Public Works, W. W. Wotherspoon, in two letters to plaintiff, called attention to the fact that the amount of water " that can be fed through the north tunnel, the old locks and the south race is not sufficient to maintain the lower level; " also that some of the mills were not able to obtain their full requirements of water and suggested that " the mill owners anticipate this condition and so adapt the race to present conditions as will enable them to secure the water they desire." In the letter

of December 18, 1918, he says: "You will recall that some time ago, the Department suggested to you *that you make such provision on the south hydraulic race so that sufficient water would be available for your use* even when the water is lowered by the Department's feed through the south tunnel." Again: "It would seem that unless some provision is made by your company on your south race to meet your own requirements, during periods of low water it is quite certain that you will be cut off from water next year during a considerable period." The plaintiff and its lessees for ninety years had been, and were then, using this surplus for the plants they had been induced by the State to build on the strength of the lease. After such undisputed use the State, through its Superintendent, called upon plaintiff to bear the expense of making the necessary alterations, which it did, at the cost of $36,000. Mr. Wotherspoon was the Superintendent of Public Works. Under the Canal Law he must execute the laws relating to navigation and improvements of the canals and is empowered, subject to the control of the Legislature, to make rules and regulations for the use of the canal and for navigation. It was a part of his duty to provide for by-passing the surplus waters at Lockport. Certainly, whether or not the State is estopped by his acts, his acts were a continuation of the construction which had been put upon this contract during its life by the Legislature and the Canal Commissioners. A lessee of water power would never think of questioning the authority of the Superintendent of Public Works to direct further improvements in order to enjoy the privileges granted by its lease. We recall here that it is the present Superintendent of Public Works who has notified plaintiff of the intention of the State to limit plaintiff's use of the water. The acts and matters above recited should "have great if not controlling weight upon the interpretation of this" lease. (*People* v. *Home Ins. Co.*, 92 N. Y. 328, 337.) The "rules of common honesty and justice which bind individuals" must bind the State here. (*People ex rel. Graves* v. *Sohmer, supra.*) If this were a question between individuals could there be any doubt?

It is said that the policy of the State in respect to leasing surplus waters from the canals has been changed since 1826. But a change in its policy does not change its valid outstanding contracts; nor does it disclose that the earlier contracts were improvidently made. In the light of the considerations, other than the money item, we cannot conceive how this leasing can be considered an improvident act, due to carelessness or wrong. There are no charges of deceit, fraud, collusion or other chicanery in connection with the leasing. Here we have no water grabbers or thieves. If there have

been water thieves other than the lessee or users under this lease, such wrongdoing cannot be an excuse for breaking it. The State has not, through negligence or oversight, lost anything; it leased what it intended to lease.

As appears in the findings there is no pretense that the present use of this water interferes with navigation. The State does not assume to act under the reservation in the lease when its Superintendent threatens to shut the water from plaintiff's raceways; it intends simply to secure a larger rental from plaintiff or from some others.

The Erie Canal was and is the main waterway connecting the Great Lakes with the Hudson river and the Atlantic ocean. The Barge Canal is but an improved Erie Canal which the Constitution says shall not be sold, leased or otherwise disposed of, but " shall remain the property of the State and under its management forever." (Const. art. 7, § 8.) The Lockport locks of the Erie Canal are the locks of the Barge Canal.

The judgment should be reversed and judgment awarded determining that the plaintiff is entitled under its lease to use all the surplus waters of the canal at Lockport, subject only to the rights reserved in the lease and granting an injunction restraining the Superintendent of Public Works from shutting off the surplus waters of the canal from conduits or raceways leading to the plants of the plaintiff and its lessees.

We make findings of fact and conclusions of law in accord with this opinion. Findings may be prepared and, if not agreed upon, may be presented to the court for settlement.

HINMAN, HILL and HASBROUCK, JJ., concur; WHITMYER, J., dissents, with an opinion.

WHITMYER, J. (dissenting). The action has been brought to determine the extent of plaintiff's right to the use of so-called surplus canal waters, delivered at the head of the Lockport locks of the Erie Canal, at Lockport, N. Y., and to restrain the Superintendent of Public Works of the State from interfering with the use thereof by plaintiff and its sublessees.

The claim is made under a lease from the State, made January 25, 1826, to predecessors of plaintiff. The State has been included on the theory that conflicting rights in real estate are involved. No objection is made on that ground.

The other defendants are sublessees.

The canal was finished in 1825. The level from Lake Erie to Lockport was maintained by water brought in from Lake Erie.

At Lockport there was a drop of about sixty feet to the next level, about sixty miles long, called the long level, extending to Rochester. Locks were constructed at the drop for the ascent and descent of boats. All the water delivered at the head of the locks was not required for lockage. It could not be discharged through the locks without damage. Some was lost by leakage. It was estimated that there would be an excess above the requirements for lockage and the loss by leakage and it was determined that this excess could be spared for use, between the head and the foot of the locks, by by-passing it around the locks, so as to protect the locks, and by returning it to the canal at the foot of the locks. It was thought that industries would be stimulated thereby, with the result that the State would receive increased tolls.

Accordingly, on April 20, 1825, the Legislature passed chapter 275 of the Laws of 1825, turning the matter over to the Canal Commissioners of the State, with certain powers. Thereupon, the Commissioners made the lease and the question is whether it was limited only to the excess waters as of the time when it was made or included all of the subsequent increases resulting from subsequent enlargements of the canal.

It is a question of construction and interpretation.

Plaintiff claims that the terms are ambiguous, but that practical construction, based upon acts, resolves the ambiguity in its favor.

The State claims that the terms are not ambiguous.

Without ambiguity, the doctrine of practical construction is not applicable. (*City of New York* v. *N. Y. City R. Co.*, 193 N. Y. 543.) But, if applicable, only acts of officials within the scope of their authority may be considered.

In determining the question, it must be remembered that the act, under which the lease was made, was the source and the limit of the authority of the Commissioners, and that the act and the lease must be considered together.

The act provided that " Whenever, in the opinion of the Canal Commissioners, any water may be spared from either the Erie or Champlain Canal, or any canal or work which has been or shall be constructed by the authority of the State, without injury to the navigation or safety thereof, in such case the Canal Commissioners are authorised to lease the said waters to such person or persons as may be willing to give the highest annual rent therefor, reserving, however, in the lease to be given, the right to limit, control or wholly resume the said waters, and all the rights granted by any such lease, whenever, in the opinion of said Commissioners, or of the Legislature, the safety of such canal or works, or the necessary supply of water for the navigation of any canal which now is or

hereafter may be constructed by the authority of the State, render such limitation, control or resumption necessary. * * *."

It contained another provision for the payment of the rent annually and one that, where the waters were resumed, no damage or compensation should be paid or allowed to any one for any improvements or erections made in consequence of the lease.

Pursuant thereto, the Commissioners, on June 13, 1825, advertised for bids " for the disposal of the surplus waters which may be spared from the canal at the waste weirs connected with the public works at Lockport."

Bids were received on July 25, 1825, and the highest one was from Richard Kennedy for $200 annual rent.

Kennedy then sold one-half of his interest to Junius H. Hatch and a lease was given to them on January 25, 1826.

By this the Commissioners granted and leased to them, their heirs and assigns, " all the surplus waters, which, without injury to navigation, or security of the canal, may be spared from the canal at the head of the locks, in the village of Lockport, to be taken and drawn from the canal at such place and in such manner and to be discharged into the lower level at such place and in such manner as the said Canal Commissioners shall from time to time deem most advisable for the security of the canal and for the convenience of the navigation thereof," and they reserved to themselves and to the Legislature " the right to limit, control or wholly resume the said waters, and all the rights granted by this lease, whenever in the opinion of the said Canal Commissioners, or of the Legislature, the safety of the canal or its appendages, or the necessary supply of water for the navigation of the canal shall render such limitation, control or resumption necessary." And it provided for the yearly rent of $200. It did not provide for limitation, control or resumption without the payment of damages or compensation as provided in the act. Plaintiff now owns the lease.

The water was not in the canal when the act was passed, but was in when the lease was made.

The maintenance of the long level required a constant flow of water. It was furnished through a by-pass from the head around the locks to the foot and was the water not needed for lockage and not lost by leakage. It was brought from Lake Erie.

The lease did not specify the amount of water which was granted, but the prism was forty feet wide on the water surface, twenty-eight feet wide at the bottom and four feet deep.

It was stipulated that the water required at the head of the locks, at the time the canal was opened, to maintain the upper level, was 125.17 c. f. s., leaving 109.11 c. f. s. for the long level, after deducting 16.06 c. f. s. for lockage and leakage.

Work of enlarging the canal was commenced in 1838. The Legislature declared it to be completed in 1862, but it was actually completed in 1874.

It was stipulated that the amount required after this enlargement was 473.14 c. f. s., leaving 423.14 c. f. s. for the long level, after deducting 50 c. f. s. for lockage and leakage.

Plaintiff constructed a tunnel on the north side about 1859, while this work of enlargement was in progress. The purpose was to by-pass an increased amount of water to the long level.

The Barge Canal was built about 1905, and it was stipulated that the amount required at the head to maintain the long level at its highest efficiency was 1,200 c. f. s., less 250 c. f. s. required for lockage and leakage, leaving 950 c. f. s. for the level.

An increased amount of water was delivered at the head with each enlargement and plaintiff and its lessees and grantees used it until November 25, 1908, when the then Commissioner of Public Works served notice of cancellation of the lease. The rent was paid to January 1, 1909. In 1913 the Canal Board adopted a resolution terminating the lease, whereupon plaintiff commenced a proceeding by mandamus. In that proceeding the court found, among other things, that the surplus water furnished under the lease, in 1913, was substantially as furnished for many years before and at all times since January 1, 1907, and that the changes in the canal at Lockport were not such as to preclude it in the same manner in the future.

The State appealed from the decree which was made, but the appeal was withdrawn upon the stipulation that the decree was to be considered as an adjudication only that the 1826 lease was a valid lease and that all other questions, particularly the one as to the amount of water which was granted under the lease, were to be left open and undetermined.

That is the question to be determined now.

The claim is based upon the lease and not upon prescription.

The act authorized the Commissioners to lease, whenever in their opinion " any water may be spared." The notice was for the disposal " of the surplus waters which may be spared." And the lease was of " all the surplus waters which * * * may be spared."

The duration of the lease and the quantity of water leased were not specified. Upon these facts is based the claim that all surplus waters for all time, however created, were covered. But the lease could be terminated without the payment of damages or compensation whenever, in the opinion of the Legislature or the Canal

Commissioners, navigation and the safety of the canal required. And the amount of water as of the time when the lease was made could be closely estimated.

Moreover, the rental was to be only $200 per year, and, if that amount was reasonable for that time, it would appear that subsequent increases were to be gratuitous, unless the Legislature and the Commissioners had in mind only the desire to stimulate industry in that section and were wasteful of public property, a conclusion which should not be adopted lightly. It would seem, therefore, that the lease was to be perpetual only as to the water which could be spared, as of that time, subject to the right to terminate in accordance with its terms.

That conclusion is confirmed by the provisions of the act and of the lease.

" Whenever " in the opinion of the Canal Commissioners any water could be spared from either the Erie or Champlain Canals or any canal or work, constructed or to be constructed, without injury to navigation or safety, " in such case " the Commissioners were authorized to lease " the said waters," with the right to limit, control or wholly resume, as stated. " Whenever " means " at whatever time." Thus, it would seem that more than one time and more than one lease were contemplated. Next, a determination that water could be spared was required in advance of any lease, and, if favorable, a lease of " the said waters " could be made, namely, the water which, under the determination, could be spared. Clearly, that referred to the water as of the time of the determination.

While the act and the lease indicate that some increase at the head was anticipated, the subsequent increases from the subsequent enlargements and the later change to the greatly enlarged Barge Canal, along a different route, except at this place, could not have been, unless it be assumed that the interests of the State could be and were ignored.

It seems clear that there was no intention to cover future increases, especially by enlargements, and that a further determination was contemplated after each increase, to be followed by a further lease if the determination was that additional waters could be spared.

The joint resolution of the Legislature in 1831, before any increase or enlargement, confirms this view. That was against further leases of canal waters, except the surplus waters at Black Rock and the Troy dam.

And the reports of legislative committees in 1833 and 1870, and of the Canal Board in 1834 and 1839, also confirm it. These were to the effect that further leasing of surplus waters was inexpedient and recommended revocable licenses for the future.

In its brief, the State admits that some leases were made after the passage of the act, but claims that those relating to the surplus waters of Black Rock and the Troy Dam were excepted from the 1831 resolution, and that those at West Troy Arsenal and the Glens Falls feeder and the so-called Rhoderick Price lease were authorized either by joint resolutions or by special acts. As to this the record is not clear.

And chapter 595 of the Laws of 1897, subsequently re-enacted in section 111 of the Canal Law (Laws of 1909, chap. 13), is a confirmation.

Thereby the Legislature authorized the Superintendent of Public Works, with the approval of the Canal Board, " to make a lease of any of the surplus waters of the canals of this State arising from enlargement or improvements of the same, actually made, or in progress, which waters shall not be necessary for the navigation or operation of such canals, or may be withdrawn for use for power and returned without detriment thereto, and which have not heretofore been leased."

Significance has been attached to the words " which have not heretofore been leased," but the real significance is in the fact that leases were authorized of surplus waters arising from enlargement or improvements of the canals and not theretofore leased, leaving the inference that it was deemed that such waters had not passed under the existing leases.

Plaintiff relies upon chapter 42 of the Laws of 1858 as a legislative declaration of its rights to increases.

It is true that the work of the first enlargement had been commenced in 1838 and was going on when the act was passed. And, according to the stipulation which was made, an increased volume of water had been coming to the head of the locks since 1842.

By the act, plaintiff's predecessor was " authorized and empowered to purchase and hold, in fee simple, any real estate contiguous to the mill race belonging to said company, and between said race or any mill race which said company may hereafter construct and the Erie Canal, provided said company shall deem such real estate convenient and suitable for manufacturing purposes, and it shall be lawful for said company to dispose of any of its real estate and rights of water to other corporations or individuals, for manufacturing purposes, by grant or lease," with the same force and effect as if made by an individual owner seized in fee simple.

It also provided for a lump sum payment of the yearly rent, payable under the " perpetual lease of the surplus waters at Lockport," granted by the Canal Commissioners to the lessees January 25, 1826.

Plaintiff calls it a confirmatory act, but it will be observed that the construction and extent of the grant are not indicated.

And the right to dispose of " rights of water " related only to the waters which passed, and the lease was perpetual only as to those waters, until it was terminated as therein provided.

The Barge Canal was completed about 1905. Thereby, waters in largely increased amounts were delivered at the head of the locks and were carried around by the tunnel on the north and the raceway on the south and were used by plaintiff and its lessees, without serious objection until a little later. In addition, the State built a fore-bay on its lands on the south side, at the head of the locks, connected by a by-pass with the canal at the foot. And a Commissioner of Public Works required plaintiff to lower the tunnel on the north, which it did at a cost of $36,000. But the gates controlling the water into both raceway and tunnel were owned and built by the State within the canal lines and the water could be passed around on the State's lands.

And section 16 of the Barge Canal Act (Laws of 1903, chap. 147), as added by chapter 494 of the Laws of 1907, provides that " the waters, surplus or otherwise, created or impounded as a result of the improvement of the Erie, Champlain and Oswego canals, * * * shall not be leased, sold or otherwise disposed of," until the improvement of said canals, as contemplated, shall have been finally completed, " nor thereafter until authorized by statute setting forth specific terms, conditions and restrictions governing the same."

Plaintiff claims that its rights under its lease may not be cut down until the lease is terminated and the State resumes as provided therein.

It is apparent that State officials were remiss, but it appears that the lease was only of the excess waters as of the time when it was made and that the use of subsequent increases was only by inaction on their part or by an implied permission, which was not effectual to confer a right.

I think that the judgment should be affirmed.

Judgment reversed on the law and facts, and judgment rendered determining that plaintiff is entitled, under its lease, to use all the surplus waters of the canal at Lockport, subject only to the rights reserved in the lease, and granting an injunction restraining the Superintendent of Public Works from shutting off the surplus waters of the canal from the conduits or raceways leading to the plants of the plaintiff and its lessees.

This court reverses the following findings of fact: Nos. 26 (after the word " but "), 60, 61, 62, 65, 79, the words " without any written

authority therefor," 81, 82, 83; and disapproves the conclusions of law in conflict with the opinion of this ccurt, VIII to XLIV, inclusive.

This court makes findings of fact and conclusions of law in accordance with its opinion. Findings of fact and conclusions of law may be prepared, and if not agreed upon they may be settled before VAN KIRK, P. J.