Dorothea E. Donaldson, J.
Amadeus, Inc. and the State of New York entered into Contract Con-H-48C on June 21, 1960 for the construction of water and sewage plants at the Lake Welch Recreational Area, Harriman State Park, Rockland County, New York. The completion date was to be on or before December 23, 1960.
On June 29, 1964 this claim was filed alleging three causes of action; the first cause of action was predicated upon a breach of contract; the second was based on extra work which was alleged to be outside the contract requirements; the third cause of action was pleaded as an alternative to the first and second causes. The second cause of action enumerated 54 separate items alleging additional work plus extra payment for labor, material, supervision, overhead and profit, etc. The third cause claimed reasonable value for all the work performed contending that the State, having breached its contract, was liable in quantum mendt.
The State requested that, in the event of an award to claimant, liquidated damages be assessed pursuant to the contract.
The defendant maintained that the contract provisions relating to notice and protest and force-account records, combined *29 with claimant’s failure to properly comply therewith, relieved it from liability.
The proposal and contract comprised 82 pages. On the title page was printed the contract number, the phrase “ Contract Documents for the Construction of” and the time and place for the opening of the proposals. The second page stated, ‘1 Contract and Specifications ”, “ Including: Definitions of Terms, Instructions to Bidders and Proposal Requirements, Award and Execution of Contract, Estimates and Payment, Proposal or Bid Contract, Description of Contract Bond, General Conditions, Special Conditions, Detail Specifications.” Other documents necessary in the determination of liability were the State Architect’s Standard Specifications (hereinafter referred to as S.A.S.) and the Public Works Specifications (hereinafter referred to as P.W.S.). Claimant contended that although the work performed at the request of the engineers associated with the job was within the requirements of the contract, the S.A.S. and P.W.S. were not so incorporated within the contract provisions as to prescribe what procedures were necessary to establish a claim for disputed work.
Incorporated in the definitions of terms on Page 2 of the contract was: ‘ ‘ The agreement covering the performance of the work, and the furnishing of materials in the construction of the project. It shall include the Proposal, Instructions to Bidders, Proposal Requirements, Plans or Drawings, Specifications, Contract Bond, and any and all supplemental agreements which may be subsequently entered into to complete the project.”
It will be noted that the two specifications referred to are not included, nor mentioned in any other definition. That paragraph purporting to define the term “ Specifications ” read as follows: ‘ ‘ The body of directions, requirements, etc., contained in this document, together with all documents of any description, and agreements made (or to be made), pertaining to the methods, (or manner) of performing the work, or the quantities and quality (as shown by test records) of accepted materials to be furnished under this contract. Specifications shall also include the notice to bidders, proposal, contract agreement and bond. ’ ’
Under the general conditions of the contract and its specifications, article 15 thereof provided for additions, deductions and deviations. Part A of that article stated that if the contractor was to do additional work as ordered in writing by the engineer where the work was of such a nature that it was already included and itemized in the proposal, the cost to the State would be the cost as shown in the proposal. Any work that was not included *30 in the contract would he done as extra work; the price was to he agreed upon prior to the actual performance. The workers and the equipment to be used were to be agreed upon between the parties before the, commencement of the work and other provisions relating to materials and machinery, trucks and equipment were to be incorporated therein. This agreement was to be in- writing and approved by the engineer. The contract continued that, where the sum could not be agreed upon by the parties or where the method of payment was not practical, the extra work was to be done on a “Force-Account” basis. Part B of article 15 provided for the manner of payment of force-account work. All claims for extra work were to be submitted to the engineer by the 20th day of the month following the month in which the work was actually performed. No requirements concerning notice or protest were stated. No reference was made for forfeiture but if the contractor was unable to or refused to comply with the article, the engineer had the option to withhold payment until such defect was cured.
Article 27 provided that the contract could be nullified upon the engineer’s decision that the contractor had willfully violated, or had failed to furnish an adequate plant or number of workmen, to prosecute the work diligently, to comply with the progress schedule, or had unnecessarily delayed the work or without consent assigned a subletting of the contract. Upon that decision by the engineer, the security could be forfeited and the construction materials delivered to the site could become the commission’s property. This article also provided for notice to the contractor of the engineer’s intention to declare the contract null and void and to demand that the contractor show cause why this action should not be taken.
The executed contract repeated the foregoing. Added to the proposal and contract were the bond provisions and the contract specifications and description, the latter enumerated the items to be accomplished. . In section 5, the standards of performance to be followed were listed including the S.A.S. and P.W.S. All work, materials and methods were to be in accordance with the specifications issued by the State of New York Division of Architecture. The next sections included general specifications and contained directions to the contractor; e.g., section 19 — Carpentry, stated, “follow S.A.S. (State Architect’s Specifications) as it applies to this work ”.
The theory that all provisions of the P.W.S. and the S.A.S. were not incorporated into the contract is one of first impression in this court. The State is no less bound by its position as a sovereign in its relationship with contractors as is an indi *31 vidual corporation. (Danolds v. State of New York, 89 N. Y. 36; Hydraulic Race Co. v. Greene, 230 App. Div. 374, affd. 257 N. Y. 540.) The rules of honesty and fair play are paramount in order to insure that the work performed be done to the benefit of the public. (Campbell v. State of New York, 240 App. Div. 304; Dunbar & Sullivan Dredging Co. v. State of New York, 259 App. Div. 440.) A contract is to be construed most strongly against the person who is drafting it. (Rusciano & Son Corp. v. State of New York, 201 Misc. 690, affd. 281 App. Div. 733.) The language in the contract and the definitions of terms concerning the contract, its specifications, the plans and drawings, and other such terms of art, made no mention of incorporating the entire body of the P.W.S. and S.A.S. The question, then, is whether it was the intention of the parties to include these two documents as part of the agreement. (First Nat. Bank of Warwick v. Mitchell, 46 Misc. 30.) Neither party is without experience in construction projects, so that it is their experience which sheds the greatest light on the intention of the parties. (Depot Constr. Corp. v. State of New York, 23 A D 2d 707, affd. 19 N Y 2d 109.) The use of the specifications in the projection of costs and formulation of plans is not denied by either party. The contractor knew that it was required to operate under these specifications when the contract itself did not delineate the manner of performance. The P.W.S. defined contract documents to be not only those included in the contract and proposal but also its specifications. The S.A.S. contained no such definition. The resulting ambiguity must be resolved by the manifested intention of the parties as evidenced by their conduct prior to and subsequent to the signing of the contract and its execution.
The court believes, and so finds, that it was the intention of the parties to include all the provisions not in conflict with the contract proper within the contract documents.
The court finds that the first cause of action is proper and that the sum, $16,876.05, in the possession of the State from retained percentages, has been wrongfully withheld. The law continues to abhor a forfeiture. Upon cancellation of the contract, whose total expenditure was $253,521, the State only expended the amount of $744.78 in order to complete all the unfinished contract items. The claimant, therefore, is entitled to receive $16,131.27 which is the sum retained by the State less the amount of money paid by it for the completion of the contract.
The P.W.S. for “Disputed Work ” stipulated that if the contractor believed that the work it had been ordered to per *32 form was extra work and not contract work, or that any order of the engineer violated the provisions of the contract, the contractor was required to give written notification to the Superintendent while continuing the work. This work was to be recorded daily both by the engineer and the contractor and to include items such as labor, material and equipment. The contractor was not prejudiced by the record-keeping and had the right to claim damages if he submitted the records to the engineer. If the Superintendent determined the work was “ extra ” or that the order was not proper, then a written supplemental agreement covering this work was to be submitted to the contractor for execution.
In the section relating to “Extra Work, Deductions and Supplemental Agreement ”, the State Engineer was given power to omit any portion of the work and to make allowances for additions and deductions without providing the contractor with grounds for a damage claim, loss of anticipated profits or variations in the amount of estimated quantities and actual quantities. The contractor was instructed to disregard any such changes without a written supplemental agreement executed by both the contractor and the Superintendent. This supplemental agreement was, in fact, a new contract as to those items covered by it and included provisions for payment and account work. The claimant alleged 62 separate and distinct items as extra work.
In accordance with the decision rendered by Judge Hiscock in Borough Constr. Co. v. City of New York (200 N. Y. 149) the contractor in order to recover must have protested to the engineer. He may not recover if the work was so clearly outside the contract that a reasonable man in the position of the contractor would undoubtedly consider it beyond the contract’s scope.
The interposing of the defense of failure to protest and other contract provisions by the State does not necessarily preclude the disregarding of these provisions where it is obvious from the conduct of the parties that they, themselves, had chosen a different method. (Joseph S. Egan, Inc. v. City of New York, 17 N Y 2d 90.) Should the court find that the work performed by the contractor was neither extra work nor additional work but, in fact, were changes beyond the contemplation of the parties or the provisions of the contract, the contractor is entitled to compensation. (Tufano Contr. Corp. v. State of New York, 25 AD 2d 329.)
The correspondence between the parties pertaining to the problems of the contractor was extensive. Although the letters were not couched in words using the exact form of the provi *33 sions for protest, there is no doubt the contractor considered action on the problems required extra Avork. The State therefore rcceÍAred notice. The State was under no obligation to accept the interpretation of the contractor as to the character of the Avork being done; it is under an obligation not to equivocate. Nor may it bill the contractor AArith the hope of remuneration by carrying on negotiations by means of conferences Avith the Chief Engineer and oral telephone messages Avithout incurring responsibility for the actions of the claimant. If the State Avishes strict compliance to the contract, including those technicalities dealing Avith the form of notice and protest, then it must insist upon them during the contract as Avell as after it.
In many instances the State accepted the benefits conferred on it through the contractor’s Avork, Aldrich Avas not so far from the contract as to be patently Avithout contract limits. The contract in many instances could not have been completed had this Avork not been performed. Accordingly, the State has waived those provisions of the contract which required orders in writing to be a part of the contract. (Abells v. City of Syracuse, 7 App. Div. 501.)
The conflict in testimony concerning the oral orders or changes and the State’s subsequent denial or claim the changes were made at the request of the claimant, sIioav the difficulty under Avhich the parties operated during this construction project. Certainly it was an expensive and time-consuming requirement that orders must be Avritten, but both parties Avere aware this Avas necessary in order to protect the public from collusion and expensive Avaste. (Borough Constr. Corp. v. City of New York, supra.) The rule is still valid that the claimant, to recover, must prove the amount of cost to him, over and above that originally contemplated in the contract. The court, hoAvexwr, must first determine Avhether that Avork was, in fact, not originally contractually contemplated or covered in the contract clause giving the engineer poAATer to change specifications Avithout giving the contractor a right to additional compensation. There is evidence that the State denied liability for changes early in the contractual period. The failure of the claimant to insist upon or to protect itself by requiring that the State provide written changes and approvals is not the State’s responsibility. The building of a public improvement is not an adversary proceeding between the contractor and the State but it can deteriorate into this by an mrwillingness on each side to recognize the difficulties inherent in a large undertaking. Certainly the claimant cannot expect changes to be made in the contract solely for its OAvn financial benefit once the contract has been bid upon and *34 accepted. The purpose of the bidding mechanics is to protect the public by providing the State with the lowest possible price and the highest possible quality for the work to be performed. For the claimant to require extensive and innumerable changes without valid reason during the period of the contract is to preclude it from seeking redress in this court for extra financial burdens without demonstrating the compliance with the concomitant contract restrictions concerning approval of project changes.
It should be noted that the claimant has admitted full knowledge of the requirements set forth in the contract and companion architectural and public works specifications. It was also aware of the requirement that it inspect the area of the contract site before making its bid. This it failed to do.
The contract provided that the engineer may make changes as he sees fit. Such changes can be embodied in a written statement without the necessity of fixing compensation at that time. The changes made during the course of this contract, whether at the request of the State or at the request of the claimant, were not fundamental nor were they capricious or arbitrary.
In most instances the court does not find that the items claimed to have been extra were such that could be compensated for by the application of the rules concerning the differentiation between the quantitative and the qualitative changes of the contract. (Depot Constr. Corp. v. State of New York, supra; Yonkers Contr. Co. v. State Thruway Auth., 25 A D 2d 811.)
The court does find that the following items of the claim are compensable to claimant: Item No. 10, concerning the extra height of the water tank, claimant is awarded the sum of $1,124.98; Item No. 12, drawings which pertain to construction forms rather than those drawings pertaining to the qualifications as set out in the S.A.S., the court awards $218.38; Item No. 30, pertaining to costs involved in the resetting of the water pump, the court awards the sum of $178.72.
Claimant’s motions to conform the pleadings to the proof and to amend the claim are granted. Defendant’s motion made at the close of claimant’s case pertaining to the third cause of action pleaded in the claim is granted; all other motions made at the same time are denied. State’s motion made at the close of the trial for the dismissal of the second cause of action is granted on the merits except as to Items Nos. 10,12 and 30. All other motions, upon which decision was reserved, are now denied.
Defendant’s counterclaim for liquidated damages is dismissed fqr failure of proof,
*35 Accordingly, claimant is awarded for the first cause of action the sum of $16,131.27, and for the second cause of action the sum of $1,522.08, totaling the amount of $17,653.35, with interest thereon from the 29th day of June, 1962 to December 29, 1962 and from June 29,1964 to the date of entry of judgment herein.
The parties submitted 793 findings of fact and 41 conclusions of law, two thirds of which were requests by the claimant. Many of these findings merely paraphrase testimony, do not properly reflect an ultimate fact nor embody a single finding. Counsel have a duty to assist the court, with respect to the submission of requests to find, in a manner that does not unduly burden or restrict the limited amount of time available to the court. Therefore, the court has left unmarked, as refused, many of the requests which contain prolix redundancies within which the voluminous record is duplicated or are unrelated to the facts or legal principles upon which the court’s decision is based.