VILLAGE NURSING HOME, INC., Appellant-Respondent, v DAVID
AXELROD, as Commissioner of Health of the State of New
York, Respondent-Appellant.

First Department, May 11, 1989

## APPEARANCES OF COUNSEL

*Robert A. Forte* of counsel *(Robert Abrams, Attorney-General,* attorney), for respondent-appellant.

*Frederick I. Miller* of counsel *(Garfunkel, Wild & Travis, P. C.,* attorneys), for appellant-respondent.

## OPINION OF THE COURT

ELLERIN, J.

Plaintiff is a not-for-profit corporation which owns and operates the Village Nursing Home (the Home), a 200-bed residential health care facility located at 607 Hudson Street in New York City. Approximately 92% of the Home's residents are Medicaid recipients. Defendant Commissioner of the New York State Department of Health is responsible for setting the Medicaid reimbursement rates for facilities such as the Home.

Plaintiff commenced this action seeking to annul the defendant's final Medicaid rate-setting determination for the Home, dated December 5, 1983. Plaintiff complains that defendant calculated the capital cost component of the Home's Medicaid reimbursement rates on the basis of the "historical cost" and "net depreciated value" of the Home pursuant to an appraisal methodology promulgated under the applicable Department of Health regulations, rather than on the basis of the provisions of the 1977 contract whereby plaintiff assumed operation of the Home.

Prior to 1976, the Home was operated as a proprietary, for-profit nursing home. On March 31, 1976, pursuant to court order, the Home was placed in involuntary receivership and Jewish Home and Hospital for the Aged, Inc. was appointed

receiver. Shortly thereafter, to insure that the care being provided to the patients at the Home would continue after the expiration of the involuntary receivership on September 30, 1977, various local nonprofit community groups worked together with plaintiff and the State to develop a plan whereby plaintiff would take over operation of the Home. As a result, the parties executed the contract here at issue on September 12, 1977. The signatories to the contract were the newly created plaintiff corporation, the New York State Department of Health, the involuntary receiver, the then landlord of the premises, and a nonprofit corporation, "Caring Community", representing a consortium of community groups.

The Preamble to the agreement states that:

"[T]he foremost concern of all the parties to this Agreement and, presumably, the foremost concern of HEW as well, is that the high level of patient care currently being provided to the more than 200 patients at Village continues without interruption.

"To this end, this Agreement makes provision for the termination of the involuntary receivership, the appointment of a voluntary receiver who will become the permanent, established licensed operator of Village, and the adoption of a viable plan for the elimination of Life Safety Code deficiencies within twelve months after the effective date of a new provider agreement between HEW and the voluntary receiver."

The agreement is an elaborate document containing detailed plans for the plaintiff's proposed operation of the Home, first as a voluntary receiver, then as the permanent operator, and, ultimately, as owner of the facilities upon its purchase from the landlord.

The following provisions of the contract are particularly relevant to the instant litigation:

Section 8: "[The Department of] Health agrees that the following are elements of cost that are reimburseable according to Health's rules and regulations: (a) The 'Net Depreciated Value' of the facility at the time of closing as determined by the Department's Bureau of Capital Cost Financing. As of June 30, 1977, said value was approximately $453,899. * * * Health agrees that it will adjust the rate of reimbursement in light of the determination made pursuant to (a) and (b) above, and pursuant to Article 28 of the Public Health Law and the regulations promulgated thereunder."

Section 28: "Landlord agrees that the rent for the Facility

will be at the rate of $120,000 per annum from and after the effective date of this Agreement until the termination of this Agreement or the purchase by [plaintiff] of the Facility, whichever sooner occurs".

In accordance with the agreement, plaintiff became voluntary receiver of the Home on September 30, 1977. On August 4, 1978, the voluntary receivership terminated and plaintiff became the licensed permanent operator of the Home. From September 30, 1977 until March 6, 1979, plaintiff leased the Home from the Landlord at the contractual rate of $120,000 per annum, or $10,000 per month. On March 6, 1979, plaintiff purchased the Home.

For purposes of this litigation, Medicaid capital cost reimbursement may be divided into three distinct time periods: (1) September 30, 1977 to August 3, 1978, during which plaintiff operated the facility as voluntary receiver, while leasing the premises; (2) August 4, 1978 to March 5, 1979, when plaintiff operated the facility as permanent licensed operator, while continuing to lease the premises; and (3) March 6, 1979 onward, when plaintiff both operated and owned the premises. There is no dispute with respect to the first period during which plaintiff was reimbursed in accordance with the rental rate set forth in section 28 of the agreement. Plaintiff, in its fifth cause of action, challenges the Department of Health's computation of reimbursement rates during the second period, that is, after the plaintiff became permanent operator of the Home, and claims that the amount of that reimbursement was also required to be in accordance with the lease rental specifically referred to in section 28. Plaintiff's remaining causes of action relate to the Department's computation of capital cost reimbursement for the third period, that is, after plaintiff became the owner of the premises.

This appeal is from the motion court's denial of the parties' respective motions for summary judgment on the basis of purported issues of fact as to the correct "historical cost figure" and "net depreciated value", whether plaintiff was entitled to all rental expenses, and "the interest [sic-intent] of the parties as to the various provisions of the contract".

■ Contrary to the decision of the motion court, we find that there are no factual issues present here that require a trial. As both sides acknowledge, the intention of the parties can be derived from an interpretation of the agreement itself without reference to extrinsic evidence and is, therefore, a

question of law to be decided by the court. *(See, Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 291; *Rentways, Inc. v O'Neill Milk & Cream Co.*, 308 NY 342.)

We turn first to the issue of the capital cost reimbursement. The capital cost component of a Medicaid reimbursement rate is computed by using the "historical cost" of the particular asset as a base and applying to that base the formula set forth in the Department of Health's regulations (10 NYCRR 86-2.19 —86-2.21). The result of this computation is the "net depreciated value" (NDV) of the asset. It is important to note that "historical cost" means the actual original cost of the asset in distinction to its resale or market value or value pursuant to a lease.

Prior to the execution of the agreement in issue, the defendant Department arrived at the NDV figure of $453,899 referred to in section 8 of the contract based on an undocumented historical cost figure of $746,594 which was supplied to the Department by the Home's prior operator. It is undisputed that plaintiff Village played no role whatsoever in providing any information to the Department with respect to the building's historical cost, nor is there any contention that Village at any time possessed, or had access to, any such information. Indeed, the record contains an internal memorandum of defendant Department, dated May 19, 1977, which indicates that the information provided by the then landlord of the building would have resulted in an NDV of $345,261 as of December 31, 1975. Notwithstanding this information, the Department determined, for purposes of section 8 of the agreement, which was executed some four months thereafter, that the NDV as of June 30, 1977, was approximately $453,899.

It is defendant Department's position that this approximate figure was never intended to be used for reimbursement purposes but was for use of the Public Health Council, the entity which was required to review the financial feasibility of a facility's continued operation as part of its responsibility for approving any change in the operator of the facility. In other words, the Department set the approximate NDV for the Home "to allow the Public Health Council to evaluate whether or not it was financially feasible to establish the receivership and keep the Home operating or let it close". The fact that the Public Health Council would be making this serious determination in reliance on information known to be

erroneous, or at the very least infirm, appears to have been of little concern to defendant Department.

After the contract was executed on September 12, 1977, Village received capital reimbursement payments during the entire "lease" period based upon the amount of its rental obligation as set forth in the agreement. When Village became the owner of the Home on March 6, 1979, capital reimbursement payments were made by the defendant on the basis of the approximate NDV set forth in paragraph 8 of the agreement until September 24, 1980 when the Commissioner advised Village of the intention to recalculate the capital cost reimbursement component in accordance with the procedures authorized by 10 NYCRR 86-2.21 (g) (1), which applies to "every facility for which records on the historical cost * * * are not available or not verifiable", rather than on the basis of the approximate NDV set forth in the contract. Thereafter, the Commissioner arrived at a revised NDV figure of $344,274 instead of the $453,899 mentioned in the contract. The Commissioner also determined that the capital cost reimbursement based on the revised NDV figure was to be retroactive to August 4, 1978, when the voluntary receivership terminated and Village became the licensed operator of the Home, notwithstanding that as of that date Village was still leasing the premises at the rental rate provided for in the agreement, and continued to do so until March 6, 1979 when it purchased the Home.

Plaintiff does not deny that it has never had any records to establish the Home's historical cost nor does it dispute the accuracy of the $344,274 NDV figure when calculated in accordance with the Department's appraisal procedures in the absence of specific historical data. Plaintiff contends, however, that because defendant was fully aware of the circumstances regarding plaintiff's lack of information in this regard at the time that the agreement was entered into in 1977, the defendant is obligated to continue to reimburse the plaintiff Home on the basis of the $453,899 NDV figure specified in the agreement so long as the Home continues to operate and "a provider agreement with HEW is in effect", a condition under paragraph 32 of the agreement.

Defendant Commissioner on the other hand, contends that the agreement, which he terms the "1977 Receivership Agreement", did not bind him to either the approximate NDV figure in section 8 or the lease-based rental under section 28 beyond the receivership period and that once the receivership

ended and plaintiff became the licensed operator of the Home, which occurred on August 4, 1978, the Home became subject to whatever reimbursement regulations were then in effect without any reference to the agreement. In essence, the Commissioner argues that the termination date of the agreement was the date that plaintiff's voluntary receivership ended.

While the sharply differing positions of the parties are predicated upon their respective views of the duration of the agreement, the agreement itself contains no specific date of termination. The critical issue to be determined, therefore, is the term of the contract insofar as defendant Commissioner's obligations are concerned.

The purposes of the agreement, as set forth in the Preamble, as well as various of its specific provisions, make clear that the term of the agreement was not intended to be limited to the receivership period but was to extend beyond that date in various respects to insure that the Home became a viable ongoing entity. For example, the reference to Life Safety Code deficiencies, one of the prime reasons for the agreement, contemplates adoption of a viable plan for the elimination of such "deficiencies within twelve months after the effective date of a new provider agreement between HEW and the voluntary receiver", while the agreement provides that the maximum period of time of the receivership shall be nine months.

It was not, however, contemplated that the agreement would continue indefinitely as plaintiff argues. Plaintiff's reliance on section 32 which states that the agreement "shall remain in effect *only* during such time as a provider agreement with HEW is in effect" (emphasis added) is misplaced. It is clear that that section is intended as a limiting provision which imposes as a condition to the continued viability of the 1977 contract that such HEW provider agreement also be in effect and it cannot reasonably be construed as affirmatively extending any obligations of the parties under the 1977 agreement beyond that agreement's own terms.

With respect to the issue of the NDV, section 8 itself expressly delineates the relevant time frame. In reciting the elements of cost that are reimbursable according to Health's rules and regulations, subdivision (a) specifically provides for the " 'Net Depreciated Value' of the facility *at the time of closing* as determined by the Department's Bureau of Capital

Cost Financing." (Emphasis added.) The section concludes with the statement that the rate of reimbursement would be adjusted in light of that determination and pursuant to article 28 of the Public Health Law and the regulations promulgated thereunder. Section 8 clearly and unambiguously makes "the time of closing" of title to the Home, upon plaintiff's purchase thereof, the critical date for determination of the NDV and also expressly provides for adjustment of the reimbursement rate in light of the NDV determination made at that time. While an approximate NDV is specified as of June 30, 1977, the section read as a whole nowhere makes that figure the predicate for the NDV of the facility at the time of closing. On the contrary, the plain language of the section puts plaintiff on notice that the NDV would be calculated, at the time of closing, by the Bureau of Capital Cost Financing in accordance with the statute and regulations then controlling. While plaintiff apparently anticipated that the NDV ultimately calculated would not differ greatly from the stated approximate NDV as of June 30, 1977, the agreement which it signed made no such representation and plaintiff is bound by that agreement.

While the contractual provision is clear in defining the rights and obligations of the parties to this litigation, the statement that the NDV had an approximate value of $453,899, as of June 30, 1977, does raise some troubling concerns. The record is undisputed that this estimate was arrived at solely by the Department itself despite the fact that the information provided by the original owner would not, according to the Department's own internal records have supported a figure of that magnitude and, yet, the Department asserts that this figure was calculated for purposes of the application to be filed with the Public Health Council on behalf of the Home. The Council is a quasi-legislative body statutorily charged with reviewing the need for a proposed institution, the character and competence of the individuals who will comprise the licensed operator and "the financial resources of the proposed institution and its sources of future revenues". (Public Health Law § 2801-a [3].) A serious question of propriety is raised by the defendant Department's acknowledgment that it provided another governmental agency, the Public Health Council, with an inflated "approximate" NDV figure on which that Council was to rely for purposes of determining the financial feasibility of the facility's continued operation, although the Department itself never intended that figure to serve as the basis for the actual capital cost reim-

bursement payments to be made to plaintiff facility, notwithstanding that the amount of those payments would necessarily be a major factor in realistically evaluating the Home's future financial stability. These dealings with the Public Health Council, however, do not affect plaintiff's position within the context of the instant action which is based upon the contract that was freely entered into by both plaintiff and defendant. It is the clear and unambiguous terms of that agreement which must control on the issue of the appropriate NDV to be used for reimbursement purposes.

With respect to the rent which plaintiff was obligated under the agreement to pay to the prior owner of the facility, defendant Department again argues that its obligation to reimburse plaintiff on the basis of the rent paid terminated once the receivership period ended, notwithstanding that plaintiff was required to continue to pay the stipulated rental until it purchased the facility, some seven months thereafter. Defendant asserts that once the receivership ended, and Village became the licensed operator of the Home, the Department was required to calculate Village's reimbursement on the historical cost basis of the home, and its calculation thereof in 1980 was made retroactive to August 4, 1978, the date the receivership ended. Under this revision plaintiff was allowed reimbursement at the rate of $3,800 per month from August 4, 1978 to March 5, 1978, although plaintiff had paid $10,000 per month to the landlord during that period, pursuant to the agreement signed by all the parties.

■ Here, again, the agreement defines the extent of the obligation. Section 28 provides that "rent for the Facility will be at the rate of $120,000 per annum *from and after the effective date of this Agreement until the termination of this Agreement or the purchase by Home of the Facility, whichever sooner occurs*" (emphasis added). Significantly, section 31 of the agreement provides that "[a]fter Home has acquired title to the Village facility pursuant to the Contract of Sale, *the Landlord* shall have no further rights or obligations under this Agreement" (emphasis added). No similar provision appears in the agreement with respect to the termination of the Department's rights or obligations either at the time of the termination of the voluntary receivership or at any other specified period. While the absence of a provider agreement with HEW, at any time, would have terminated the entire agreement, and vitiated the rental and other obligations, nowhere in the agreement is there any provision which re-

lieves defendant Department of specifically delineated obligations merely by virtue of the ending of plaintiff's voluntary receivership.

In construing a contract, the agreement is to be read as a whole and every part will be interpreted with the whole in seeking to give each clause its intended purpose in the promotion of the primacy and dominant purpose of the contract. (*Williams Press v State of New York,* 37 NY2d 434, 440.) Here, the primary purpose of the agreement was to prevent the closing of the subject nursing home and to insure its continued operation in an economically viable and structurally safe manner. As earlier indicated, this purpose was to be accomplished through the creation of the nonprofit plaintiff corporation which would take over operation of the Home, first as the voluntary receiver, then as the permanent licensed operator who would also ultimately assume the ownership of the facility.

Both sections 8 and 28 of the agreement make the time of the purchase of the Home, or the closing of title thereto, a critical date. In section 8, the NDV to be used for future reimbursement purpose was to be calculated "at the time of closing". That date takes on increased significance in light of section 28 which sets forth the monthly rental obligation to be paid until purchase of the facility by plaintiff. Reading those two sections together it is clear that the rental amount was to be the basis for reimbursement until plaintiff became owner of the Home, after which reimbursement was to be on the basis of the NDV calculated "at the time of closing". Defendant's theory that upon termination of the receivership, capital cost reimbursement was to be on the basis of the NDV, is wholly at odds with the express language of the agreement. Ironically, if defendant's argument were to be accepted, and reimbursement for the period from termination of the receivership to the time of closing was made on the basis of the NDV, such would necessarily have to be based on the approximate NDV of $453,899 specified in section 8 of the contract since the final NDV was not to be calculated until the time of closing.

Defendant's argument that the lease-based rental could not apply after the receivership period because it did not fall within the statutory exceptions for leases, is put forth in a vacuum which completely ignores the existence of the agreement that the Department signed and encouraged. The 1977 agreement was executed pursuant to section 2810 (1) of the Public Health Law which gave the Department great latitude

in entering into an agreement in connection with the receivership of a residential health care facility by permitting it to do so "under whatever conditions as shall be found acceptable by both parties". As written, the contract terms make clear that one of the conditions here agreed to by the parties was that the rental paid by plaintiff prior to its purchase of the Home would be the basis of its reimbursement during that time. While defendant Department acknowledges that it was obligated to reimburse plaintiff for that sum during the receivership period (although the same claimed statutory "prohibition" prevailed at that time), it states it was not obligated to do so after that period had terminated. However, the contract which it signed makes no such distinction and it is bound by the terms of that agreement in precisely the same way that plaintiff is bound. When a contract to which the State is a party comes before the courts " ' "the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law" ' " and "[t]he rules of construction which apply between persons apply to the State". *(Hydraulic Race Co. v Greene,* 230 App Div 374, 375, *affd* 257 NY 540; *Amadeus, Inc. v State of New York,* 55 Misc 2d 27, 30-31.)

Accordingly, the order of the Supreme Court, New York County (Kenneth Shorter, J.), entered on or about January 30, 1986, which denied both plaintiff's motion and defendant's cross motion for summary judgment, should be modified, on the law, to grant defendant's cross motion for summary judgment dismissing the first, second and third causes of action, and to grant plaintiff summary judgment on its fifth cause of action, and otherwise affirmed, without costs.

SULLIVAN, J. P., ROSS, MILONAS and ROSENBERGER, JJ., concur.

Order, Supreme Court, New York County, entered on or about January 30, 1986, unanimously modified, on the law, to grant defendant's cross motion for summary judgment dismissing the first, second and third causes of action, and to grant plaintiff summary judgment on its fifth cause of action, and otherwise affirmed, without costs and without disbursements.